MARK SHERIDAN *et al.*

*v.*

H. D. COLVIN *et al.*

1. CITY COUNCIL OF CHICAGO—*powers of, under the act of April* 10, 1872. The city of Chicago having been reincorporated under the act of April 10, 1872, to provide for the incorporation of cities and villages, the city

| 78 | 237 |
| --- | --- |
| 32a | 49 |

| 78 | 237 |
| --- | --- |
| 137 | 671 |

| 78 | 237 |
| --- | --- |
| 141 | 601 |

| 78 | 237 |
| --- | --- |
| 151 | 53 |

| 78 | 237 |
| --- | --- |
| 160 | 554 |

| 78 | 237 |
| --- | --- |
| 56a | 586 |

| 78 | 237 |
| --- | --- |
| 102a | 5457 |
| 102a | 6457 |

| 78 | 237 |
| --- | --- |
| 201 | 7 14 |
| e201 | 7 15 |
| 201 | 5 16 |
| e103a5 | 69 |
| e103a7 | 69 |
| 103a | 7467 |

council possess the power to provide for the appointment of a city marshal, and to vest him with the entire control of the police force, and to reorganize the police department by ordinance, and to carry out and give effect to the provisions of such ordinance when passed.

2. And when such an ordinance is passed, it takes the functions given to the board of police, by the act of their creation, away from them, and confers them upon the officers named in the ordinance.

3. SAME—*board of police.* Where the city council, under the act of 1872, have reorganized the police department of the city, and provided for the control and management thereof, the authority of the board of police over the police force of the city, being inconsistent with the plenary power conferred upon the city council over the subject matter by the act of 1872, ceases.

4. The city council have no power to pass an ordinance abolishing the board of police, or the office of commissioner of such board, but they may deprive them of all their functions as city officers; and such an ordinance can only be sustained as applying to the board of commissioners in their capacity of city officers.

5. CHANCERY—*courts of, have no jurisdiction of subjects purely political.* The subject matter of the jurisdiction of courts of chancery is civil property. The court is conversant only with questions of property and the maintenance of civil rights. It has no jurisdiction in matters merely criminal or immoral, which do not affect any right of property, nor do matters of a political character come within its jurisdiction.

6. A court of chancery has no jurisdiction to interfere with the public duties of any department of government, except under special circumstances, and where necessary for the protection of the rights of property.

7. Equity will not interfere, by injunction, to restrain persons from exercising the functions of public offices, on the ground of the want of binding force in the law under which their appointments were made, but will leave that question to be determined at law.

8. In this case, it was sought to enjoin the city council of a city from enforcing an ordinance, on the sole ground that, if the ordinance was enforced, it would deprive the complainants of the functions of offices which they held in the city: *Held,* that a court of chancery had no jurisdiction.

APPEAL from the Circuit Court of Cook county; the Hon. W. W. FARWELL, Judge, presiding.

April 23, 1875, an election was held in the city of Chicago, under the provisions of the general act to provide for the incorporation of cities and villages, approved April 10, 1872,

with a view to incorporation under that act. Upon a canvass of the votes by the common council, a majority was declared to be found in favor of such new incorporation, but proceedings, in the nature of a *quo warranto,* were soon thereafter instituted to determine the validity of the same, which are still pending. Assuming to act under such new incorporation and the provisions of said act, the city council, June 28, 1875, passed an ordinance, approved by the mayor, for the reorganization of the police department of the city. The ordinance contains seventeen sections, and those deemed material to the questions involved are as follows:

*"Be it ordained by the city council of the city of Chicago:*

"SECTION 1. There is hereby established and created an executive department of the municipal government of said city, to be known as the police department.

"§ 2. There is hereby created the office of city marshal of said city. The term of said office shall be two years, commencing with July 1, 1875, and the salary attached to said office shall be $4000 per annum. The said city marshal shall be appointed by the mayor, with the approval of the city council. He shall be the head of the police department, and shall give a bond, with security to be approved by the mayor, in the sum of $25,000, conditioned for the faithful performance of the duties of his office, and that he shall well and truly account for and pay over all moneys, and surrender any and all property, books and papers which may come into his hands as such city marshal, on the expiration or sooner termination of his term of office. He shall, as such head of the police department (subject to all general ordinances of the city), assume and exercise the control of the police force of the city, and shall possess full power and authority, subject to all general ordinances of the city council, over the police organization, government, appointments and discipline within the said city, and shall have the custody and control, subject to the direction of the city comptroller, of the public property,

books, records and equipments belonging to the police department.

"§ 3. The said city marshal, as such head of the police department, shall be charged with the duty of preserving the peace of the city, preventing crimes and arresting offenders, of protecting the rights of person and property, preserving order and providing a proper police force at every fire, protecting strangers and travelers at steamboat landings and railway stations, and causing to be enforced all ordinances of the city.

"§ 4. The duties of the police force shall be executed under the direction and control of said city marshal, and according to the rules and regulations which he may promulgate, from time to time, for the more proper government and discipline of the subordinate officers and the police force of the city, and reasonable forfeiture of pay may be imposed by such rules and regulations for any neglect of duty or misconduct.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"§ 6. It shall be the duty of the city marshal, from time to time, to divide the city into police districts, and to assign captains and sergeants of police to each of such districts, and he may establish a station, or sub-station, in any precinct, for the accommodation of the police force on duty therein. All regulations and orders made by said city marshal shall be promulgated through the superintendent of police.

"§ 7. The city marshal may appoint persons of suitable character, who may be in the employment of the city, in other branches of the city government, as special policemen; but such persons so appointed shall receive no pay for their services as such special policemen. Such policemen shall possess the same powers as the regular police patrolmen, and shall be subject to all the rules and regulations governing the police force.

"§ 8. The city marshal shall have power, on the application of any person or persons showing the necessity thereof,

to appoint and swear any number of additional police patrolmen to do duty at any fixed place within the city, at the charge and expense of the person or persons by whom the application is made. Such persons so appointed shall conform to, and be subject to, all rules and regulations governing the police force of the city, and to such special rules and regulations as the city marshal may make concerning such police patrolmen. They shall possess all the powers, privileges and duties of the regular police patrolmen, and may be removed or discharged from service, at any time, by the city marshal, with the written concurrence of the mayor.

"§ 9. The city marshal may, also, upon an emergency, or riot, pestilence, invasion, or with the written consent of the mayor, during any public election or celebration, appoint as many special patrolmen, from among the citizens of Chicago, as he may deem necessary, and for a specified time, and during the term of service such special patrolmen shall possess all the powers and privileges and perform all the duties of patrolmen of the standing police force of the city.

\*　\*　\*　\*　\*　\*　\*　\*　\*

"§ 17. The police force, as heretofore existing, shall continue to be the police force until otherwise changed under this ordinance; but the board heretofore known as the board of police, and the office heretofore known as that of commissioner of the board of police of the city of Chicago, shall cease to exist, and no duties shall hereafter be performed or powers or authority exercised in connection with said police force by said board, or any commissioners of the Board of Police of said city, after the passage of this ordinance."

Appellants being police commissioners of said city at the time of such alleged new incorporation thereof, as aforesaid, filed their bill in chancery in the circuit court of Cook county, June 30, 1875, against the mayor, the individual members of the common council, the comptroller and treasurer, to restrain all acts under said ordinance, upon the sole grounds that

242          SHERIDAN *et al.* *v.* COLVIN *et al.*          [Sept. T.

Opinion of the Court.

complainants, as such commissioners, possessed the only authority to control the police force, its organization, government, appointments and discipline, in said city, with the right to the custody and control of all public property, books, records, etc., belonging to said department, and that the common council had no power or authority to divest them, by means of such ordinance, of such control, functions or custody, and confer the same upon a city marshal. A temporary injunction was issued, pursuant to the prayer of the bill, which the court afterwards, upon general demurrer, dissolved, sustained the demurrer for want of equity, and, complainants electing to stand by their bill, it was dismissed by the court, and they appealed to this court.

Messrs. FULLER & SMITH, for the appellants.

Messrs. GOUDY & CHANDLER, for the appellees.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

Elaborate printed arguments have been filed by the counsel for the respective parties in this case, and able and exhaustive oral arguments delivered at bar, all of which, having been considered, we are prepared to give our conclusions.

It is not claimed by counsel for appellants, that the validity of the new organization of the city, under the general act of 1872, can be, in any respect, drawn in question in this suit. Such a question can be determined only by a direct proceeding, in the nature of a *quo warranto.* Assuming, then, that the city of Chicago became incorporated under that act, by virtue of the election held April 23, 1875, the provisions of the act of 1872 thereby became its charter, to which we must look for the extent of its corporate authority, with such limitations as may be found to arise from the provisions of section 6 of the act.

With these preliminary observations, we will proceed to state, as briefly as possible, our views and conclusions.

The case resolves itself into three principal questions, viz: (1.) Had the city council the power, under the provisions of the act of 1872, to pass the ordinance in question ? (2.) What is the nature of the power thereby sought to be exercised? (3.) Had the court of chancery jurisdiction to interfere with its exercise ?

These questions will be considered in the order stated.

First, then, as to the power. That question can properly be determined only by a consideration of the legal *status* of the police commissioners at the time of the new incorporation of the city, and reference to the several provisions of the act of 1872, pertinent to the subject. We have, however, no concern with the legal *status* of the police commissioners, any farther than relates to their functions as city officers. Now, the act creating the board of police, declares that "the said board shall assume and exercise the *entire* control of the police force of said city, and *shall possess full power and authority over the police organization, government, appointments and discipline within said city.*" By the same law that board also had the custody of all property belonging to the police department.

Such was the authority vested in the board of police, composed of appellants, at the time of the new incorporation of the city, under the act of 1872, and it amounted to an exclusive control over the police force of the city. But it has not been, and can not be, denied, that these functions and their continuance with these municipal officers, were entirely subject to legislative control. The legislature could, in its discretion, provide for the creation of another officer, and for taking these functions from the board of police and bestowing them upon that officer. Appellants' counsel concede this, but insist that the legislature has not done so. Let us see whether this be so or not. Upon this point we would say, that, in our opinion, from a consideration of the whole scope and purpose of the act, as well as the provisions of section 3, the new incorporation did not, *ipso facto*, repeal the act creating and defining the powers and duties of the po...

missioners, or abolish their office *in toto.* That section says :
"If a majority of the votes cast at such election shall be 'For
city organization under general law,' such city shall thence-
forth be deemed to be organized under this act; and the city
officers then in office shall, thereupon, exercise the powers
conferred upon like officers in this act, until their successors
shall be elected and qualified."

This clause, taken in connection with one in section 6,
evinces the legislative intent, in respect to the manner in
which re-incorporation should be effected. The latter is as
follows : "And from the time of such organization or change
of organization, the provisions of this act shall be *applicable*
to said cities and villages, and all laws in conflict therewith
shall *no longer be applicable.* But all laws or parts of laws
not inconsistent with the provisions of this act shall continue
in force, and applicable to any such city or village, the same
as if such change of organization had not been made."

There is a plain difference between a legislative declaration,
that an inconsistent prior law shall not be *applicable* to certain
municipal corporations, and one, that it is repealed. The
legal effect of that provision is, that, if the law creating the
board of police, or any prior statute relating to a corporation
reorganized under the act of 1872, shall be found in conflict
or inconsistent with any of the provisions of that act, such
inconsistent law shall no longer have any applicability within
the territorial limits of such new organization. If such in-
consistent law originally applied beyond such territorial lim-
its, it may continue to do so, but not within them. The act
of 1872, like much of our legislation, is wanting in that
complete mechanism requisite to the exact fitting of one part
with every other part, so as to make one harmonious whole.
But the intention of the legislature to provide a general sys-
tem of local municipal government required by the policy of
the constitution prohibiting the passage or alteration of city
charters by special law, and to enable existing corporations to
effect changes in their organic law with as little disturbance

as possible, is very apparent from the whole act.  The powers confided to the local legislative department of such new corporations are broad and plenary, especially as respects the police department, the only matter now before us; and one object of the clauses from the 6th section above quoted, clearly was, to remove all obstacles arising from prior laws, to the exercise of such powers.

The first subdivision of section 62, article 5, of the act of 1872, gives the city council the control of all the finances *and property* of the corporation.  This, of course, would include the property belonging to the police department, the entire custody of which, by prior laws, was given to the board of police.

Subdivision 66 of the same section gives the power *to regulate the police of the city, and pass and enforce all necessary police ordinances.*  Sixty-eight, to prescribe the duties *and powers* of a superintendent of police, policemen and watchmen.

By section 73 it is provided that "the city council may, in its discretion, from time to time, provide by ordinance for the election by the legal voters, or appointment by the mayor, with the approval of the city council, of a city collector, *a city marshal,* a superintendent of streets, a corporation counsel, a city comptroller, or any or either of them, and such other officers as may by said council be deemed necessary or expedient."  This section further provides: "The city marshal shall perform such duties as shall be prescribed by the city council, for the preservation of the public peace and the observance and enforcement of the ordinances and laws."

Section 74 provides that "all officers of any city, except where herein otherwise provided, shall be appointed by the mayor, (and vacancies in all offices except the mayor and aldermen shall be filled by like appointment,) by and with the advice and consent of the city council.  The city council may, by ordinance not inconsistent with the provisions of this act, prescribe the duties and define the powers of all such officers, together with the term of any such officer, provided the term shall not exceed two years."

246          SHERIDAN *et al. v.* COLVIN *et al.*          [Sept. T.

Opinion of the Court.

It seems to us clear, beyond doubt, that, by these several provisions, ample authority is conferred upon the city council to not only provide for the appointment of a city marshal, and vest him with the entire control of the police force, but to reorganize that department, as purports to be done by the ordinance in question. If the council had the power to pass the ordinance, it must have the power to carry it into effect; and if it had the power to pass and enforce it, then the effect must be to take the functions given the board of police, by the act of their creation, away from that board, and confer them upon the officers named in the ordinance. The continued possession, therefore, by the board of police of an exclusive authority over the police force, is utterly inconsistent with the exercise of the plenary power over the subject matter conferred upon the city council by the act of 1872, and by force of the 6th section of that act, the prior law can no longer be applicable.

The last section of the ordinance, it is conceded by appellees' counsel, is too broad. But that can not affect the other provisions of the ordinance, because they are in no respect dependent upon it. It may be regarded as applying to appellants only as city officers, in which view it might be sustained. For, authority in the city council to take away their functions as city officers, which we think the council has, is virtually to deprive them of their offices, so far as they were such city officers.

The second question is, what is the nature of the power sought to be exercised, in passing the ordinance under consideration? To that question there can be but one answer, and we shall not stop to discuss it. The power is legislative and discretionary.

The third and last question is: Had the court of chancery jurisdiction to interfere with the exercise of that power? We are clearly of opinion that it had not. The subject is purely political. The only title to relief shown by the bill is that arising from the mere fact of complainants being

police commissioners, vested, as it is alleged, with the entire control of the police force, etc.  The bill does not go upon the theory of any property right, but is an application to a court of equity to restrain the city council and other officers of the city from carrying said ordinance into effect, on the ground that it will deprive them of the functions of their office.  It is elementary law, that the subject matter of the jurisdiction of the court of chancery is civil property. The court is conversant only with questions of property and the maintenance of civil rights.  Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests.  The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property.  Nor do matters of a political character come within the jurisdiction of the court of chancery.  Nor has the court of chancery jurisdiction to interfere with the public duties of any department of government, except under special circumstances, and where necessary for the protection of rights of property.  Kerr on Injunctions, pp. 1 and 2.

In the case of *Sherlock* v. *The Village of Winnetka,* 59 Ill. 398, this court said: "There are some acts which a municipal corporation, while acting within the limits of its charter, may do, without being subject to the supervision of any court. Such acts are those done under its legislative and discretionary powers."  Willard's Eq. Jur. 405.

Again, in High on Injunctions, the author says: "A court of equity is not a proper tribunal for determining disputed questions concerning the appointment of public officers, or their right to hold office, such questions being purely of a legal nature, and cognizable only by courts of law.  Thus, equity will not interfere, by injunction, to restrain persons from exercising the functions of public offices, on the ground of the illegality of the law under which their appointments were made, but will leave that question to be determined by a legal forum, and a temporary injunction granted *pendente lite,* and, until the question of the validity of the law under

which defendants claim their office can be determined, will be dissolved." *Delahanty* v. *Warner et al.* 75 Ill. 185.

We are of opinion that the demurrer to appellants' bill was properly sustained, and that the decree of the court below should be affirmed.

*Decree affirmed.*