### *Ex parte* GEISSLER.

*(Circuit Court, N. D. Illinois.* October 30, 1880.)

1. SUPERVISOR OF ELECTIONS—POWER TO ARREST.—Under the authority of the acts of congress a duly qualified supervisor of elections has the right, in the absence of the United States marshal and his deputies, to preserve order, and to arrest, without warrant or process, any person who interferes with him in the discharge of his duty as such supervisor.

2. SAME—REGISTRATION.—It is the duty of such supervisor, among other things, to see that no person is improperly registered, and he can therefore object, if the circumstances warrant it, to the registration of a person offering himself for such purpose.

3. SAME—INTERFERENCE—OPPROBRIOUS LANGUAGE.—The use of offensive and opprobrious language may, without any overt act, constitute an interference with such supervisor in the discharge of his duty.

4. UNITED STATES—REGISTRATION OF VOTERS—ELECTION OF MEMBERS OF CONGRESS.—The United States has the right to interfere in all cases where there is a registration of voters for an election of members of congress, and, when that interference occurs under the authority of a statute of the United States, there can be no law which is paramount to it, nor is such law in derogation of the rights of the states.
   *Ex parte Siebold*, 100 U. S. 371.

   Facts in this case considered, and *held* to constitute an arrest and not an assault by a duly-qualified supervisor of elections.

*Habeas Corpus.*
*Mr. Leake*, Dist. Att'y, for the United States.
*Mr. Cameron*, for the City.

DRUMMOND, C. J. The only question in the case is whether the petitioner was legally arrested, fined, and imprisoned for the act which was done by him, as it appears from the evidence before the court. The facts seem to be substantially these: That the relator was appointed by this court a supervisor of election under the acts of congress, and qualified as such, and went before one of the boards of registration in the first ward of the city of Chicago, to discharge his duty as such, and remained there during the most of the day on the twenty-sixth of October. The registration took place in the usual way under the laws of the state, and about 8 or half-past 8 o'clock in the evening, a man who called himself Miller presented himself for registration, and some questions were put to him by the judges and answers made, which threw some doubt upon his right to registration. They were of such a character as to induce the relator, as supervisor, to object to his registration, and in consequence of that an altercation arose between the supervisor and Dwyer, who came with Miller, as to his right to vote. Dwyer claimed to vouch for Miller, and that he was entitled to registration. The supervisor insisted, on the other hand, that he was not.

There seems to be but little doubt that, prior to the act of violence which is complained of, there was offensive language used by both parties. The supervisor, while insisting that Miller should not be registered as entitled to vote, may have and perhaps did act in a manner somewhat offensive. He is obviously a man of quite excitable temperament — he showed that as a witness on the stand — and it is possible, therefore, he did not act in as discreet and prudent a way as a man of different temperament would have done. It is also true, I think, that Dwyer became excited and used improper and, perhaps, opprobrious language to the supervisor; but it is to be recollected that while we can consider, for the purpose of determining what color is to be given to a transaction, the language which is used, we have to look at the acts themselves, in order to determine whether they are legal. And we must consider the different relations of these two persons, who have both used violent language to each other, and the cir-

cumstances of the case. Dwyer was a volunteer there. He was, so to speak, an outsider. He may have had the right to come in and give his testimony in favor of the person who was presenting his claims for registration; but Geissler was there, clothed with the authority of law, and entitled to the protection of the law, as an officer of the United States. They, therefore, occupied entirely different positions.

I can have no doubt that, under the authority of the acts of congress, Mr. Geissler had the right, in the absence of the marshal and his deputies, as was the case here, to preserve order, and to arrest, without warrant or process, any person who interfered with him in the discharge of his duty as a supervisor. It was his right, among other things, to see that no person was improperly registered. He could, therefore, object, if the circumstances warranted it, to the registration of a person offering himself for registration; and that the circumstances did warrant it, is clear, because some of the judges themselves were in doubt as to his right, and therefore the objection of the supervisor was properly made.

There can be no doubt, either, that no person had a right to molest or interfere with the supervisor in the discharge of his duty, even by the use of offensive and opprobrious language. That, without any overt act, might be a molestation and interference with the supervisor in the discharge of his duty. Neither can there be any doubt that there was more or less disturbance and disorder, which followed the use of excited language. According to the weight of the evidence, as I understand it, the supervisor did tell Mr. Dwyer not to interfere, or "to stop," or "shut up," or that he would be put out; to which Dwyer returned opprobrious language, threatening to strike the supervisor; and thereupon the supervisor, having insisted he should be removed or turned out, and saying that if no one else would do it he would himself, seized Mr. Dwyer, as some of the witnesses say, by the throat, and others say by the collar, or by the breast. It does not, perhaps, matter in what particular way. He did not strike Dwyer, and was himself immediately struck by Dwyer. The question is whether what was done by the supervisor was in

pursuance of his authority as an officer of the United States there present under the law.

I do not justify in all respects the manner of the action of the supervisor. It would have been much more creditable to him if he had shown more equanimity of temper; if he had not become so excited, and if he had not returned sharp, bad language to the same kind of language. But we must make allowance for the infirmities of human nature; and we cannot suppose that a man will always be unruffled when he is attacked, and when opprobrious language is used towards him. The question is, after all, had he the right to do what he did?

Had he the right to preserve order? Had he the right to arrest Dwyer? And was he in the discharge of his duty as a supervisor? And the fact that he may not have done it in such a quiet, smooth, regular sort of way as other men of a different temperament, does not render the principal act illegal. In other words, if a man, in arresting another, where he has the right to arrest him, pushes him with more force than perhaps may be necessary, it cannot, in general, affect the question of the legality of the arrest. So here it may be that the supervisor did not act as other men of a cooler temperament might have acted under the circumstances; but he had the right, I think, to arrest Dwyer, and to preserve order by removing him from the room. The difference between the two men, as I have stated, is that the one was an outsider and the other was clothed with the authority of the law.

There seems to be some misapprehension in the public mind as to the rights of the officers of the United States in cases of this kind, as though they were interfering with the rights of the state or of the city. It is not so. The United States has the undoubted right to interfere in all cases where there is a registration of voters for an election of members of congress, and where that interference occurs under the authority of a statute of the United States, there can be no law which is paramount to it; and, as the supreme court of the United States has said, there is nothing in derogation of the rights of the states in this. *Ex parte Siebold*, 100 U. S., 371. We should move on harmoniously in the one case as in the

other—each within its respective sphere—the United States as a national government, and the state as a government clothed with all the powers which affect us as individuals—our lives, our liberties, our property, our relations to each other as citizens of the state. But when the question of nationality and of the rights of the United States as a nation arises and has to be decided, then the national power and sovereignty override what is sometimes called the sovereignty of the state. Undoubtedly, therefore, the national government has the right to prescribe in what manner representatives in congress shall be elected, and how security is to be given to the rights of electors, in order to ascertain who are legally elected. So that, while I have criticised the action of the supervisor in the performance of his duty, as I think the circumstances warrant, and also the conduct of those who interfered with him, still I must hold, under the law, that he was acting in the line of his duty, and that it was not competent for any state authority to interfere with him in the exercise of his right as a supervisor.

The only question about which I have had any doubt since hearing the testimony in the case, is whether what the supervisor did could be treated as in the nature of a mere assault upon Dwyer, and not as an arrest. If it had been done without the prior words and acts proved; if, for example, the circumstances which occurred prior to the seizure of Dwyer had not been as they were,—namely, that he had requested Dwyer, no matter in what form of language, not to interfere in any way; that he had called upon others to put him out, or to arrest him,—then it would have been different; but having done that—having said what he did—I must hold that the act, which otherwise might have been merely an assault, must be regarded simply as a seizure, with perhaps more violence than was necessary, to remove the man from the room, because he said "If no one else will remove him I will do it." The prisoner, therefore, will be discharged from custody.