**BLACKMAN et al. v. STONE et al. ***

No. 2238.

District Court, S. D. Illinois, S. D.
Oct. 22, 1936.

Hart E. Baker and David J. Bentall, both of Chicago, Ill., for plaintiffs.

Otto Kerner, Atty. Gen., for defendants.

Before EVANS, Circuit Judge, and BARNES and MAJOR, District Judges.

*Decree vacated 57 S. Ct. 514, 81 L. Ed. ——.

PER CURIAM.

Plaintiffs, on behalf of themselves and others similarly situated, have brought this suit to enjoin one Ray D. Stout, individually and as County Clerk of the County of Sangamon, Mike Godfrey, and five or six others, individually and as County Clerks of different Illinois counties, from printing the ballots for the election of November 3, 1936, without including thereon the names of the candidates designated in a certain petition hereinafter more fully described, or if said ballots have already been printed, that each of said clerks be restrained from distributing said ballots without "including thereon, by printing thereon or affixing thereto by paster, the names of candidates" named in said petition.

Plaintiffs also seek a mandatory injunction against Edward J. Hughes, individually and as Secretary of State of Illinois, Edward J. Barrett, individually and as Auditor of Public Accounts, and Henry Horner, individually and as Governor of Illinois, directing them to certify to the respective county clerks of the State of Illinois, the names of the candidates named in said petition.

Petitioners further ask that the decision and order of Clyde E. Stone, Warren H. Orr, and Norman L. Jones, Justices of the Supreme Court of the State of Illinois, sitting as state officers of the State of Illinois, be declared void and of no effect, because without jurisdiction to pass upon the sufficiency of said nominating petition.

Further relief along the same line was sought, the basis thereof being set forth in a lengthy complaint, the substance of which is that the plaintiffs and others are citizens of the United States, over twenty-one years of age, and residents of the State of Illinois for more than one year; that each is a duly qualified and registered voter of said state and that they are desirous of having the names of certain individuals (being candidates for President of the United States, Vice President of the United States, United States Senator, Members of Congress, and State Officers in the State of Illinois, all representing the Communist Party) placed on the election ballot so that said plaintiffs and others might vote for them at the November election. They assert that their names have been wrongfully kept from said ballot, and, if we narrow the state-

ment of facts to the fundamental basic questions, it appears that a petition containing over 25,000 names was filed with the Secretary of State asking that certain individuals named thereon be placed on the ballot as Communist candidates for State and Federal offices; that the plaintiffs represented more than fifty counties and that over 200 such signatures represented electors of each of fifty different counties; that upon the filing of this petition, an objection, or at least a so-called protest, was filed with the Secretary of State against the certification of said Communist Party on the ballot. The Secretary of State then sent a copy of said protest or objection by registered mail to plaintiffs and at the same time sent a notice of hearing of the Board on September 25, 1936. On said date, the Secretary of State, the State Auditor, and the Attorney General, as statutory members of the State Officers Electoral Board, met in the offices of the Secretary of State, and at said meeting the candidates of the Communist Party appeared and made what they call a special appearance, and objected to said officers acting on said Board for the reason that they were candidates for election. The said officers on the same day withdrew from, or declined to act as, said Board. On September 26th, the defendants, Stone, Orr, and Jones, each being a member of the Supreme Court of the State of Illinois, and the three being the oldest in point of service on said Supreme Court, declared themselves to be the State Electoral Board, and proceeded to hear the objections (whether they were sufficient to be called objections is challenged) of one Matthew J. Murphy to the petition of the plaintiffs.

At said meeting the candidates made a limited appearance and objected to the jurisdiction of the three justices of the Supreme Court to pass upon the so-called objections. The three justices held that they had jurisdiction and would hear the objections and they determined that the petition was insufficient.

Without going into details, it is sufficient to say that the basis of the justices' finding was that some of the voters were not qualified to sign the petition because they had already voted for other candidates for the same office in an earlier primary and were not qualified to sign a petition for a new party or other candidates. Section 5½ of the Illinois Aus-

tralian Ballot Law (Smith-Hurd Ill.Stats. c. 46, § 293) contains the following provision:

"Provided, further, that any person who has already voted at a primary election held to nominate a candidate or candidates for any office or offices, to be voted upon at any certain election, shall not be qualified to sign a petition of nomination for a candidate or candidates for the same office or offices, to be voted upon at the same certain election."

Defendants have raised a legal question which for convenience sake is stated thus: May a court of *equity* grant the relief here sought?

Plaintiffs assert an affirmative answer to this question should be given for several reasons: Avoidance of a multiplicity of suits, the inadequacy of any remedy in an action at law, and the protection of rights accorded plaintiffs by the Federal Constitution.

Defendants argue that the question must be answered in the negative because (a) the rights sought to be vindicated and protected are political rather than civil rights, and (b) courts of equity, both state and Federal, have uniformly refused to take jurisdiction of suits to protect or vindicate political rights.

A study of the authorities leaves us in no doubt as to the soundness of the defendants' second proposition, viz., that courts of equity do not assume jurisdiction of suits to protect invaded *political* rights.

In Ruling Case Law, volume 10, page 342, we find the following statement:

"Matters of a political character are also outside the pale of a court of equity, no such jurisdiction having ever been conceded to a chancery court, either in a federal or state judiciary, unless it is so provided expressly or impliedly by organic or statute laws. The political rights of a citizen are as sacred as are his rights to personal liberty or property, but he must go to a court of law for them. A court of equity is a one-man power, wielding the strong force of injunction, often issued at chambers, and on an ex parte hearing. Neither in England nor America has this power been suffered to extend to political affairs."

In the famous case of Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 642, 47 L.Ed. 909, the Supreme Court said:

"The traditional limits of proceedings in equity have not embraced a remedy for political wrongs. * * *

"The other difficulty is of a different sort, and strikingly reinforces the argument that equity cannot undertake now, any more than it has in the past, to enforce political rights, and also the suggestion that state constitutions were not left unmentioned in section 1979 [8 U.S. C.A. § 43] by accident. In determining whether a court of equity can take jurisdiction, one of the first questions is what it can do to enforce any order that it may make. This is alleged to be the conspiracy of a State, although the State is not and could not be made a party to the bill. * * * The circuit court has no constitutional power to control its action by any direct means. And if we leave the State out of consideration, the court has as little practical power to deal with the people of the State in a body. The bill imports that the great mass of the white population intends to keep the blacks from voting. To meet such an intent something more than ordering the plaintiff's name to be inscribed upon the lists of 1902 will be needed. If the conspiracy and the intent exist, a name on a piece of paper will not defeat them. Unless we are prepared to supervise the voting in that State by officers of the court, it seems to us that all the plaintiff could get from equity would be an empty form. Apart from damages to the individual, relief from a great political wrong, if done, as alleged, by the people of a State and the State itself, must be given by them or by the legislative and political department of the government of the United States."

In Green v. Mills (C.C.A.) 69 F. 852, 857, 30 L.R.A. 90, a decision approvingly cited by the Supreme Court in Giles v. Harris, the court said:

"It is well settled that a court of chancery is conversant only with matters of property and the maintenance of civil rights. The court has no jurisdiction in matters of a political nature, nor to interfere with the duties of any department of government, unless under special circumstances, and when necessary to the protection of rights of property, nor in matters merely criminal, or merely immoral, which do not affect any right of property. * * *

" 'On this branch of the inquiry, it seems to the court very clear that a court of equity cannot be invoked to prevent the performance of political duties like those committed to the officers of registration under the law. The willful, fraudulent, or corrupt refusal of a vote by judges of election, or a like denial of registration by the officer appointed to register votes, which is the same thing, can be adequately compensated for in damages at law. Bevard v. Hoffman, 18 Md. [479] 484 [81 Am.Dec. 618]. The writ of injunction will not be awarded in doubtful or new cases not coming within well-established principles of equity. Bonaparte v. Railroad Co., Fed.Cas.No. 1,-617, Bald. [205] 218. Each voter has a separate and distinct remedy for the willfully improper deprivation of his vote; and the joinder of others, like circumstanced or injured, as complainants in equity, on the ground of avoiding a multiplicity of suits, will not avail to afford equitable relief. To interfere in the mode asked for by the complainants would be to stop a popular election in one portion of the state, and thus arrest, as to it, the wheels of government. For irregularities in the conduct of an election, for receiving illegal or rejecting legal votes, and for the correction of consequences resulting therefrom, the law provides appropriate remedies and modes of procedure. Such matters are not the subjects of equitable jurisdiction.' * * * The doctrine is clearly established that courts of equity will not thus interfere to determine questions concerning the appointment or election of public officers or their title to office, such questions being of a purely legal nature and cognizable only by courts of law. * * *

"Tested by these principles, this bill of complaint cannot be maintained, for it seeks on behalf of individuals to restrain the exercise of governmental powers, and asserts no threatened infringement of rights of property or civil rights, and no recognized ground of equity interposition. No discrimination on account of race, color, or previous condition of servitude is charged, or pointed out as deducible on the face of the acts in question. * * * We repeat that the action sought to be enjoined is political and governmental, and it is not pretended that any right of property or civil right is threatened with infringement thereby."

On several occasions the Illinois Supreme Court has spoken on this question. In People v. Barrett, 203 Ill. 99, 67 N.E.

742, 743, 96 Am.St.Rep. 296, the court said:

"We think it apparent that the entire scope and object of the bill filed by Lorimer against the board of election commissioners and its chief clerk were for the assertion and protection of political, as distinguished from civil, personal or property rights. * * *

"From a diligent search of the textbooks and digests we have been unable to find a single case which sustains the position that the rights sought to be enforced by said bill in chancery were other than political, or one which sustains the position that a court of chancery may ~rant an injunction to protect the party in the enjoyment of a political right or to assist him in acquiring such right; the trend of all the authorities being in accord with the statement of Mr. Chief Justice Fuller in World's Columbian Exposition v. United States, 6 C.C.A. 58, 56 F. 654, that 'the office and jurisdiction of a court of equity, unless enlarged by express statutes, are limited to the protection of rights of property. The court is conversant only with questions of property and the maintenance of civil rights, and exercises no jurisdiction in matters merely political, illegal, criminal, or immoral.'"

. In Fletcher v. Tuttle, 151 Ill. 41, 37 N.E. 683, 686, 25 L.R.A. 143, 42 Am.St. Rep. 220, the following rule was announced:

"From the foregoing statement of these two bills it seems to be perfectly plain that the entire scope and object of both is the assertion and protection of political, as contradistinguished from civil, personal or property rights. In both the complainant is a legal voter, and a candidate for a particular elective office, and by his bill he is seeking the protection and enforcement of his right to cast his own ballot in a legal and effective manner, and also his right to be such candidate, to have the election called and held under the provisions of a valid law, and to have his name printed upon the ballots to be used at such election, so that he may be voted for in a legal manner. The rights thus asserted are all purely political. Nor, so far as this question is concerned, is the matter aided in the least by the attempt made by the complainant in each bill to litigate on behalf of other voters or of the people of the state generally. The claims thus attempted to be set up

are all of the same nature, and are none the less political.

"As defined by Anderson, a civil right is, 'a right, accorded to every member of a distinct community or nation,' while a political right is a 'right exercisable in the administration of government.' Anderson's Law Dict. 905. * * *

"The question then is, whether the assertion and protection of political rights, as judicial power is apportioned in this State between courts of law and courts of. chancery, are a proper matter of chancery jurisdiction. We would not be understood as holding that political rights are not a matter of judicial solicitude and protection, and that the appropriate judicial tribunal will not, in proper cases, give them prompt and efficient protection, but we think they do not come within the proper cognizance of courts of equity. In Sheridan v. Colvin, 78 Ill. 237, this court, adopting, in substance, the language of Kerr on Injunctions, said: 'It is elementary law that the subject of the jurisdiction of the court of chancery is civil property. The court is conversant only with questions of property and the maintenance of civil rights. Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests. * * * Nor do matters of a political character come within the jurisdiction of the court of chancery. Nor has the court of chancery jurisdiction to interfere with the public duties of any department of the government, except under special circumstances, and where necessary for the protection of rights of property.' * * *

"Other authorities of similar import might be referred to, but the foregoing are amply sufficient to show that wherever the established distinctions between equitable and common-law jurisdiction are observed, as they are in this state, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political, and where no civil or property right is involved. In all such cases, the remedy, if there is one, may be sought in a court of law. The extraordinary jurisdiction of courts of chancery cannot therefore be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office. Nor can it be invoked for the purpose of restraining the holding of an election, or of directing or

controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. These matters involve in themselves no property rights, but pertain solely to the political administration of government. If a public officer, charged with political administration, has disobeyed or threatens to disobey the mandate of the law, whether in respect to calling or conducting an election or otherwise, the party injured or threatened with injury in his political rights is not without remedy. But his remedy must be sought in a court of law, and not in a court of chancery."

Below are collected some of the many cases which announce the same applicable rule governing jurisdiction of courts of equity.[1]

A more recent decision of the United States Supreme Court is that of Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759. In that case a negro was denied by Texas statute the right to vote in the Democratic primary. The court held that he was entitled to maintain an action at law to recover damages because he was by reason of the statute denied a right which was expressly given to him by the Fourteenth and Fifteenth Amendments. Reading Nixon v. Herndon and Giles v. Harris, together, we conclude that the vital and determinative question is: Is the asserted right of the complainants to have their candidates' names appear upon the ballot a civil or a political right? If it is not a civil right but only a political right, it is clear that a court of equity is without jurisdiction to grant relief in a suit to vindicate such political right. If it is a civil right then upon the allegations showing an avoidance of multiplicity of actions of law, inadequacy of

relief through actions at law, a court of equity may take jurisdiction.

The answer to the second question necessitates a more complete statement of the facts.

Generally speaking, the relief may be said to be directed to the subject of ballots concerning which the legislature of the State of Illinois has spoken. A brief history of this legislation is set forth:

Originally, it was not considered the duty of the Government to furnish ballots to be used at elections. At least, the Government did not exercise any such powers nor assume any such duties. Candidates for office had their ballots printed or they furnished blank paper upon which names could be written and the electors voted such a prepared ballot or prepared one himself, as he desired. With the population constantly increasing and concentrating in large cities, it became apparent that orderly elections would be promoted, frauds defeated and mistakes avoided, if the state took charge of the preparation of ballots and regulated the time and place of voting. Legislatures generally provided for a secret ballot and ballots were prepared upon which the names of candidates appeared. This was a great convenience for both voters and candidates for office. From this initial step in the state's preparation of ballots, amendments to the election laws have been made which deal, among other matters, with the names of candidates which are to appear upon the ballots. It must be apparent to all that not every one can have his name printed upon the ballots. Hence it was early provided that the political parties who certify their parties' choices should have their names appear upon the official ballot. In order to per-

[1] *Equity does not give remedy for political wrongs.* Walls v. Brundidge, 109 Ark. 250, 258, 160 S.W. 230, Ann.Cas. 1915C, 980; Winnett v. Adams, 71 Neb. 817, 824, 99 N.W. 681, 684; Cleveland Cliffs Iron Co. v. Kinney (D.C.) 262 F. 980; Guebelle v. Epley, 1 Colo.App. 199, 28 P. 89; Pagosa Springs v. People, 23 Colo.App. 479, 130 P. 618; Walton v. Develing, 61 Ill. 201; Darst v. People, 62 Ill. 306; Harris v. Schryock, 82 Ill. 119; Payne v. Emmerson, 290 Ill. 490, 125 N.E. 329; Lamb v. Burlington R. Co., 39 Iowa, 333; Duggan v. Emporia, 84 Kan. 429, 114 P. 235, Ann.Cas.1912A, 719; State v. Dist. Court, 156 Minn. 270, 194 N.W. 630; Gibbs v. McIntosh, 78 Miss. 648, 29 So.

465; McAlester City Council v. Milwee, 31 Okl. 620, 122 P. 173, 40 L.R.A.(N.S.) 576; McAlister v. State, 95 Okl. 200, 219 P. 134, 33 A.L.R. 1370; Scott v. James, 114 Va. 297, 76 S.E. 283; Morgan v. Wetzel Court, 53 W.Va. 372, 44 S.E. 182; Randolph v. Stanislaus County, 44 Cal. App. 322, 186 P. 625; Winder v. King (Tex.Com.App.) 1 S.W.(2d) 587; Wilkinson v. Henry, 221 Ala. 254, 128 So. 362, 70 A.L.R. 712; League v. Brazoria Road Dist. (Tex.Civ.App.) 187 S.W. 1012; Richardson v. Mayes (Tex.Civ.App.) 223 S.W. 546; Chandler v. Neff (D.C.) 298 F. 515; Cyclopedia of Fed. Procedure, Longsdorf, § 630.

mit of the appearance on said ballot of new candidates and new parties, it was provided that such parties and their candidates might appear in one of two ways, either by choice through convention, or by nominating petitions. The present case involves merely the latter practice, although there is another case pending before the United States Supreme Court, brought by the plaintiffs and dealing with asserted nominations by convention. (Certiorari denied November 23, 1936 in Johnson v. Hughes et al., 57 S.Ct. 193, 81 L. Ed. ——).

The Illinois statute recognizes both methods, but prescribes procedure in more or less detail for those proceeding under either method. The statute, it is worthy of note, does not distinguish between individuals nor make any attempted distinctions based on color, race or any other ground. It (section 5 [Smith-Hurd Ill. Stats. c. 46, § 292]) does however require that before one can be a candidate for President or for state office and have his name appear upon the ballot that he present a petition signed by electors numbering 25,000 of the State of Illinois. These 25,000 voters must reside in different parts of the state. It requires fifty counties to be represented on the petition. At least 200 of its electors from 50 different counties must appear on the petition to make it valid. Likewise, an elector who has previously voted that same year for the same office is disqualified.

Whether plaintiffs' right to have the names of their candidates for President, Vice President, Senator, and Congressmen, as well as state officers, on the ballot involves a civil or political right is a much more difficult question than that of the power of a court of equity to act, if the right invaded be a political right. If we were to accept literally the language of the Supreme Court of Illinois (Fletcher v. Tuttle, 151 Ill. 41, 37 N.E. 683, 688, 25 L.R.A. 143, 42 Am.St.Rep. 220) when it says, it (the Supreme Court of Illinois) has likewise held that "the extraordinary jurisdiction of courts of chancery cannot, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office" the question would be settled once and for all and adversely to plaintiffs. It is, however, argued by plaintiffs that the foregoing statement is obiter and sec-

ond, it is not a correct statement of the law.

The dictionaries and text writers who have attempted to define civil rights and distinguish them from political rights have not always succeeded in accentuating the line of demarkation. Nevertheless, definitions from leading authorities like Blackstone, are helpful. Bouvier says, basing his distinctions on Blackstone,

"*Political rights* consist in the power to participate, directly or indirectly, in the establishment or management of government. These political rights are fixed by the constitution. Every citizen has the right of voting for public officers, and of being elected; these are the political rights which the humblest citizen possesses.

"*Civil rights* are those which have no relation to the establishment, support, or management of the government. These consist in the power of acquiring and enjoying property, of exercising the paternal and marital powers, and the like. It will be observed that every one, unless deprived of them by a sentence of civil death, is in the enjoyment of his civil rights,—which is not the case with political rights; for an alien, for example, has no political, although in the full enjoyment of his civil, rights. 1 Bla.Com. 124-139."

Ruling Case Law states at page 374, volume 14,

"It is a general rule that a court of equity has no jurisdiction in matters of a political nature, and that no injunction to protect a person in the enjoyment of a political right or to assist him in acquiring such a right will be granted. No such jurisdiction has ever been conceded to a chancery court, either by the English or American judiciary."

At page 375, the same authority states,

"Matters relating to elections, such as the right to vote and the like, are generally regarded as being within the application of the doctrine that equity will not interfere in matters of a political nature. The accepted rule is that the extraordinary jurisdiction of a court of chancery cannot be invoked to protect the right of a citizen to vote, or to be voted for at an election, or his right to be a candidate for, or to be elected to, any office, nor can it be invoked to restrain the holding of an election, or of directing or control-

ling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. Such matters involve no property rights, but pertain solely to the political administration of government."

Under the topic "Elections" it is stated at section 10, volume 9, Ruling Case Law,

"In considering the general powers of the courts, a distinction has been drawn between the jurisdiction of courts of equity and of law, based upon a distinction between political and civil rights. Political rights have been defined to be rights exercisable in the administration of government and comprehend the power to participate directly or indirectly in the establishment or management of the government. They are opposed to civil rights which broadly comprehend all rights accorded to every member of a district or nation. In view of this distinction, the right of suffrage being political in character, it has been generally held that its assertion and protection are not properly matters for the cognizance of courts of equity, for the subject of the jurisdiction of such courts is civil property, and they are not concerned with the maintenance of purely political rights where no civil or property right is involved. The extraordinary jurisdiction of courts of chancery cannot, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office."

See also notes in 70 A.L.R. 733 and 33 A.L.R. 1376, Re the power to enjoin the holding of an election and kindred subjects.

The opinion of the Supreme Court above quoted, written by Justice Holmes (Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909) is the more significant because of the dissenting opinions of Justices Brewer and Harlan, both of which are vigorously and feelingly expressed. They help to emphasize the line at which a court of equity stops, as held by the majority of the court. The Supreme Court in this case definitely committed this and all other Federal courts to the view that courts of equity will not act if the right invaded be a political right. It also declared certain rights (among others the right to vote and to run for office) to be political and at the same time

it announced a standard or test for the determination of other political rights.

From a reading of the decisions and the treatises dealing with political and civil rights, we conclude the instant case involves no fact which makes the right to have a name on the ballot a civil right. It is not and can not be successfully argued that any right guaranteed by the Fourteenth Amendment is denied or abridged on account of race, color, or previous condition of servitude. No right here alleged to have been invaded is a civil right. Whether the Supreme Court of Illinois was justified in going so far as to say that in all cases "The extraordinary jurisdiction of courts of chancery cannot, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate" we need not decide. We do not think that court had in mind a right to vote denied because of color. But, regardless of such limitation, we say there is no civil right here asserted. The only right is the one to have a candidate's name appear on the ballot in the face of an adverse ruling of a duly created election board, the decision of which body not being based on the protected right described in the Fourteenth Amendment.

The machinery of election which the state has provided and which it had the constitutional right to provide has made no distinctions between individuals or persons. It has given to all citizens of Illinois the right to file petitions or to nominate by convention. It has set up machinery which is in every respect reasonable and in no way arbitrary, whereby the validity of proceedings by petition may be determined and it has made the body thus created to pass upon the validity of such petitions (in this case the three senior justices of the Supreme Court of Illinois) the *final* arbiter of the validity of such proceedings (sections 10a–10c of the act [Smith-Hurd Ill.Stats. c. 46, §§ 298a–298c]). Final authority must rest somewhere. The State of Illinois, through its legislature, may legitimately determine how those final arbitrators shall be chosen as well as the qualifications of its members. The judgment of this board may be erroneous, but unless it acted outside its jurisdiction, its judgment is final and binding. Its judgment can not be successfully challenged because the challenger believes it acted unwisely or erroneously.

We have been unable to find a single case which holds that the right to vote, the right to hold office, the right "to run" for office, or the right to have a candidate to vote for, is a civil right. The Illinois Supreme Court has specifically held to the contrary. The text authorities that have spoken support the position taken by the Illinois Supreme Court. The general language of the majority opinion of Justice Holmes in Giles v. Harris leaves little doubt but that its application to the facts in the instant case would result in a holding that these rights are all political.

The following cases hold that the right to vote is a political right. Garrett v. Cunninghame, 211 Ala. 430, 100 So. 845; In re Walker River Irr. Dist., 44 Nev. 321, 195 P. 327; Stuard v. Thompson (Tex.Civ.App.) 251 S.W. 277; Walls v. Brundidge, 109 Ark. 250, 256, 160 S.W. 230, Ann.Cas.1915C, 980; Morris v. Colorado Ry. Co., 48 Colo. 147, 109 P. 430, 31 L.R.A.(N.S.) 1106, 139 Am.St.Rep. 268, 20 Ann.Cas. 1006; Russell v. State, 171 Ind. 623, 87 N.E. 13, 17; State v. Goldthait, 172 Ind. 210, 87 N.E. 133, 19 Ann.Cas. 737; Wallace v. Board of Com'rs, 46 Ind.App. 695, 92 N.E. 230; Riter v. Douglass, 32 Nev. 400, 109 P. 444; Cofield v. Farrell, 38 Okl. 608, 134 P. 407; State v. Superior Court, 60 Wash. 370, 111 P. 233, 140 Am.St.Rep. 925; Ridley v. Sherbrook, 3 Cold. (43 Tenn.) 569; Davis v. Teague, 220 Ala. 309, 125 So. 51; O'Brien v. City of Saratoga Springs, 131 Misc. 728, 228 N.Y.S. 82; Taylor v. Earlham Ind. School Dist., 181 Iowa, 544, 164 N.W. 878; Ashley v. Three Justices of Superior Court, 228 Mass. 63, 116 N.E. 961, 8 A.L.R. 1463; State v. Collins, 69 Wash. 268, 124 P. 903; Indianapolis Election Com'rs v. Knight, 187 Ind. 108, 117 N.E. 565.

It of course by no means follows that political rights are less important than civil rights nor is one whose political rights are invaded, left without a remedy. These decisions are merely to the effect that the remedy does not include injunctive relief sought in an equity suit. As Justice Fuller in Green v. Mills, supra, said: "To interfere in the mode asked for by the complainants would be to stop a popular election in one portion of the state, and thus arrest, as to it, the wheels of government."

In Winnett v. Adams, 71 Neb. 817, 99 N.W. 681, 684, the court said:

"We do not overlook the fact that primary elections have become the subject of legislative regulation, and it may be conceded that each member of a political party has a right to a voice in such primaries, and to seek nomination for public office at the hands of his party. But when he is denied these rights, or unreasonably hampered in their exercise, he must look to some other source than a court of equity for redress. To hold otherwise would establish what could not but prove a most mischievous precedent, and would be a long step in the direction of making a court of equity a committee on credentials, and the final arbiter between contesting delegations in political conventions. The voters themselves are competent to deal with such matters without the guiding hand of the chancellor, and it will make for their independence, self-reliance and ability for self-government, to permit them to do so. It is true they may make mistakes, but courts themselves have been known to err."

Plaintiffs have cited numerous cases to support their contention stated thus, "The power of the Federal Government to protect the right to vote" exists. They cite Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759, and Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458. Both of these cases were actions at law. Neither was a suit in equity and they are therefore no authority whatsoever for the proposition that a court of equity will restrain defendants from invading another's political rights. In fact, those cases indirectly emphasize the point heretofore made that the plaintiffs have their remedy at law.

Plaintiffs also cite Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717. This case, however, does not bear upon the powers of a court of equity to restrain infringement of political rights nor does it define political or civil rights. It is a habeas corpus case. One who had been a supervisor of elections was indicted for obstructing, hindering, and interfering with the performance of duties by another officer of election. The defendants were tried, convicted, and sentenced, and they sought their liberty through a writ of habeas corpus. Ex parte Geissler (C.C.) 4 F. 188, 192, and United States v. O'Connor (D.C.) 31 F. 449, are also cited. The Geissler Case was also a habeas corpus proceeding, and the judge disposing of the case said, "The only question in

110

the case is whether the petitioner was legally arrested, fined, and imprisoned for the act which was done by him."

In the case of United States v. O'Connor the court in its opinion passed upon the sufficiency of an indictment. United States v. Aczel (D.C.) 219 F. 917, was also cited, but here again we have a court passing upon a demurrer to an indictment which is not in the slightest or remotest degree · connected with the power of a court of equity to grant injunctive relief to protect a political right.

Our search for authorities outside of the briefs has not been productive of a single case which supports either of the two contentions which plaintiffs must maintain: (a) that a court of equity will act where political rights only are involved, or (b) that the right to vote or the right to have a name printed on the ballot is a civil right.

In view of the lack of jurisdiction of this court to grant the relief sought, it is unnecessary and improper to consider plaintiffs' grounds of attack on the action of the Electoral Board. They assert the Electoral Board was without jurisdiction to rule on their petition because the notices required by the statute were not given and because there was no objection to their petition. Defendants take issue with plaintiffs on these points, but we find ourselves without authority to investigate and determine these controverted issues in an equity suit.

The motion to dismiss is granted. Defendants' counsel will prepare and submit (and to opposing counsel before· submission to the court) a decree drawn in accordance with these directions.