**SOCIALIST LABOR PARTY et al.,**
Plaintiffs,

v.

James A. **RHODES** et al., Defendants.

**Glen A. WILLIAMS et al., Plaintiffs,**

v.

James A. **RHODES** et al., Defendants.

**Civ. A. Nos. 68–224, 68–248.**

United States District Court,
S. D. Ohio E. D.

Aug. 29, 1968.

William Saxbe, Atty. Gen., and Charles S. Lopeman, Chief Counsel, for the State of Ohio.

Dunbar, Kienzle & Murphey, and David S. Young, Columbus, Ohio, for Williams and others.

Jerry Gordon, and Benjamin Sheerer, Cleveland, Ohio, for the Socialist Labor Party and others.

## OPINION

Before CECIL, Senior Circuit Judge, WEINMAN, Chief District Judge, and KINNEARY, District Judge.

### PER CURIAM.

We have before us two actions recently filed in the United States District Court for the Southern District of Ohio, Eastern Division. Since common questions of law are involved, we consolidate these two cases for decision. This three-judge court, recently appointed, was put under compulsion to arrive at an early decision because of the limit of time between now and the printing of the ballots by the Ohio Secretary of State and the necessity for either party to have the right to appeal this decision to the United States Supreme Court.

The questions for determination involve the construction of the election laws of the State of Ohio and present cases of first impression, not only in Ohio but in all federal courts throughout this country.

The defendants are sued in their official representative capacities as the Governor, the Secretary of State and the Attorney General of Ohio and are common to both actions.

The Court's jurisdiction in both actions is properly asserted under Title 42, United States Code, Sections 1981, 1983 and 1988; Title 28, United States Code, Section 1343, Subsection (3); and Title 28, United States Code, Sections 2201–02.

A three-judge court was convened in each case, according to law. By authority of 28 U.S.C., Section 2284, Honorable Paul C. Weick, Chief Judge of the Sixth Circuit, appointed this Court in the Socialist case on July 12, 1968, and in the Wallace case on August 12, 1968. We will refer to these cases as the Socialist case and the Wallace case, respectively. The Socialist case was filed on July 2nd and the Wallace case on *July 29, 1968.* Both cases were advanced on the docket for hearing, the Socialist case to August 12th and the Wallace case to August 19th, the earliest possible date that it could be assigned.

The cases were submitted to the Court on the complaints, answers, motions for summary judgment, each of which was supported by affidavits, and oral arguments. The ultimate purpose of both actions is to obtain an order requiring the Secretary of State, the chief elections officer of Ohio, to place the names of the respective parties or candidates on the Ohio ballot for the November general election.

We were asked to examine, in a brief period of time, the maze of election laws of the State of Ohio and to determine that some of them are unconstitutional. If we do so find, we are asked to proceed to use extreme broad equitable powers usurping the duties of the legislature of the State of Ohio.

It is the contention of the respective plaintiffs that the Ohio Election Laws (Title 35, Ohio Revised Code) are such that it is virtually impossible for a new political party to gain recognition as a political party and correspondingly a position on the Ohio ballot. This is due primarily to the stringent requirements

of Section 3517.01 [1] of the Revised Code of Ohio. Under the Election Laws, as now in force, there is no provision for persons to qualify as independent candidates for president and vice-president of the United States. Neither do the voters have any opportunity to write in the name of any person for any office at the general election, unless there is no regularly nominated candidate for that office. Further, if there is compliance with Section 3517.01 other provisions of the Election Laws, Sections 3513.11 and 3513.12, which pertain to the election of delegates to state and national conventions and the appointment of presidential electors, must be complied with in order to get a party name on the ballot. These obstacles in obtaining a position on the ballot which a presidential candidate encounters are not denied by the defendants.

In a second cause of action in the Socialist case, the plaintiffs seek an order requiring the Secretary of State to provide a space on the ballot for "write-in" votes. The election laws of Ohio provide that, in general elections, "no blank spaces shall be provided on such ballot wherein an elector may write in the name of a person for whom he desires to vote," except for offices for which no candidates have been nominated. Sections 3505.03 and 3505.23, Ohio Revised Code. However, in primary elections, in which only qualified political parties may participate, electors may write in candidates whose names do not otherwise appear on the official ballot. Section 3513.14., O.R.C.

In response to plaintiffs' claim, defendants argue that only those candidates who have demonstrated a hope of succeeding in the general election have a right to have their names on the ballot, and that third-party and independent candidates have an opportunity to demonstrate their support by seeking write-in votes in the primary election. This argument completely ignores the fact that, if successful, such person is the candidate of the party whose primary he has won, and not a third party or independent candidate as he desires. Ohio greatly limits the choice of the voters in November by effectively limiting the names which appear on the ballot to the names of those candidates who are successful in the primary elections of qualified political parties.

The very foundation and bulwark of our democracy is the right of our citizens to participate in the selection of our governing officials. Americans treasure the right to express their political preferences by means of the ballot. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481. The Supreme Court of the United States has consistently held that qualified citizens have a constitutionally protected right to vote and have their votes counted. Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; Baker v. Carr, 369 U.S. 186,

1. A political party within the meaning of Title XXXV of the Revised Code is any group of voters which, at the last preceding regular state election, polled for its candidate for governor in the state at least ten per cent of the entire vote cast for governor or which filed with the secretary of state at least ninety days before an election a petition signed by qualified electors equal in number to at least fifteen per cent of the total vote for governor at the last preceding election, declaring their intention of organizing a political party, the name of which shall be stated in the declaration, and of participating in the next succeeding election. Such petition shall be circulated, signed, verified, and the signatures thereon examined and certified to in the same manner as is required of referendum petitions. No such group of electors shall assume a name or designation which is similar, in the opinion of the secretary of state, to that of an existing political party as to confuse or mislead the voters at an election. When any political party fails to cast ten per cent of the total vote cast at an election for the office of governor it shall cease to be a political party.

82 S.Ct. 691, 7 L.Ed.2d 663; Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368.

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, supra, 377 U.S. at page 555, 84 S.Ct. at page 1378. The electoral process is a matter of a majority of qualified voters selecting a candidate to fill a political office and a state cannot arbitrarily impair the freedom of choice which a qualified voter may exercise on election day. If a citizen is entitled to vote and have his vote count, he is entitled to vote for any candidate of his choice, subject to reasonable conditions and qualifications imposed by the State. Political participation is not limited to those who adhere to the tenets of one of the major political parties, but includes all citizens who wish to publicly demonstrate support for a certain candidate or political theory.

"Although a large majority of our people hold allegiance to the two major political parties in this nation and believe that free government is most efficiently perpetuated through a two-party system, nevertheless there are millions of independent voters who should always be given an equal right of suffrage with party members. There should be no discrimination because of a disagreement as to political principles or policies, as long as those who disagree are loyal and obedient to the Constitution." State ex rel. Beck v. Hummel, 150 Ohio St. 127, 139, 80 N.E.2d 899, 906.

As we have previously indicated, one need not have a good chance of winning to be a candidate for office. Just as the Constitution protects the right of individuals to express themselves freely, so does the Constitution permit these same individuals to seek support at election time. The right to vote is the right to vote freely and without unreasonable prohibitions as to the candidate of ones' choice.

Voters are often not content to vote for one of the candidates nominated by the two major parties. A write-in ballot permits a voter to effectively exercise his individual constitutionally protected franchise. The use of write-in ballots does not and should not be dependent on the candidate's chance of success. The denial of this unfettered freedom of choice is a denial of the equal protection of the laws as guaranteed by the Fourteenth Amendment. Voters cannot be denied the right to express themselves politically through elections, merely because state officials fear that such voters profess ideas and philosophies contrary to the ones generally prevailing among the electorate. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

The defendants have offered no satisfactory explanation for the prohibition of write-in ballots and their argument is untenable. Furthermore, "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." Carrington v. Rash, supra, at page 96, 85 S.Ct. at page 780. A blanket prohibition against the use of write-in ballots denies the qualified electors of Ohio the right to freely participate in the electoral process as guaranteed by the Constitution and violates the "equal protection" clause of the Fourteenth Amendment. Therefore, Sections 3505.03 and 3505.23, O.R.C. are unreasonable and void so far as they do not provide space on the ballot for write-in candidates.

The plaintiffs in the Wallace case seek to have the name of George C. Wallace placed on the ballot as a candidate for president of the Wallace American Independent Party. To qualify Mr. Wallace they attempted to get 433,100 valid signatures required by Section 3517.01 but were subsequently advised by the Secretary of State that this would not be sufficient because of the failure to comply

988

with certain provisions of the Primary laws, viz. Sections 3513.11 and 3513.12.

Accordingly, the Wallace action relies entirely upon the number of signatures they have secured in attempting to qualify under the provisions of Section 3517.-01 even though they have not qualified as provided by the Primary Election Laws of the State of Ohio. They further request the Court to use extraordinary equitable powers to place the Wallace name on the November ballot. Many decisions are set forth in their briefs as to the use of such equitable relief but in all cited cases involving the reapportionment question and/or the desegregation cases such equitable relief was not used by any Court until the principles involved had been enunciated in cases that had reached the Supreme Court of the United States. The equitable powers of the trial court were then used by direction of the Supreme Court in order to carry out the provision of its mandates.

We conceive a political party to be an organization of some permanence, consisting of electors who have some basic theories of government. The so-called Wallace American Independent Party does not possess the attributes of a traditional political party. Mr. Richard C. Kochensparger, state chairman of the organization, says in an affidavit that the sole reason this party was formed was for the purpose of obtaining ballot position for Mr. Wallace in the November election. The formation of this party was decided upon when it was conceived as the only method of getting his name on the ballot. They would have preferred to use the independent nominating petition method, as was used in most of the other states, but this method was denied to them under the Ohio law.

Candidates of organized parties are to be distinguished from independent candidates whose candidacy is built around the personality of an individual. While we would be inclined to the belief that the ten and fifteen percent provisions of Section 3517.01 are unreasonable, we are not prepared to say that the provisions for organization of state and national conventions are unreasonable. Our primary election is an instrument for the functioning and government of parties. Each party nominates its candidates who will participate in the general election. In presidential years, the parties elect delegates to national conventions. The delegates at these conventions choose the party candidate for president and vice-president. The parties' state conventions choose the party presidential electors. This is the democratic process.

While only the names of candidates for president and vice-president appear on the ballot, the voters do not vote directly for them. According to the Constitution of the United States, only presidential electors, who meet subsequent to the election and vote for president and vice-president, are voted for and elected at the general election. United States Constitution, Art. II, Section 1. Under Ohio Election Laws a vote for president and vice-president is a symbolic vote for the electors pledged to the candidate for whom the vote is cast. Section 3505.10 O.R.C. The selection of electors is an important step in the election process. They are certified to the Secretary of State by the State conventions. Mr. Kochensparger says in his affidavit,

"(O)ur party is either prepared to allow the state central committee to appoint presidential electors or to have them elected at a state convention. If this Court orders relief which will require the Secretary of State to accept our 26 electors only if they are certified to him as having been elected at a state convention, we shall conduct a state convention."

It is also stated by affidavit that a national convention will be held and that it can be stated without fear of contradiction that Mr. Wallace will be nominated for President of the United States.

This all has the appearance of a fictional party organized from the top down for the purpose of trying to comply

with the Ohio law to get Mr. Wallace's name on the ballot rather than a duly organized party from the bottom up in search of a leader. Mr., Wallace, as an individual, has announced himself as a candidate of the so-called "Wallace American Independent Party" for President of the United States. He has built a national organization around himself. This classifies him as a potential independent candidate rather than as a party candidate.

We look then to the Ohio Election Laws on the qualifications for independent candidates. In 1948 Henry Wallace sought a position on the presidential ballot in Ohio as an independent candidate. At that time only the name of the candidates for president and vice-president who had been nominated at party conventions appeared on the ballot. The names of candidates for presidential electors were not printed on the ballot and a vote for the candidates for president and vice-president was a vote for the respective presidential electors pledged to vote for the candidates for whom the vote was cast. The Henry Wallace committee had petitions signed by 46,000 electors. The petitions purported to nominate Henry A. Wallace and Glen H. Taylor for president and vice-president and twenty-five named persons for presidential electors. In State ex rel. Beck v. Hummel, supra, the court held that presidential electors are state officers and that under Section 4785–91, Ohio General Code, which provided for the nomination of independent candidates, the Wallace Committee was entitled to have the names of its candidates for presidential electors printed on the ballot.

■ In 1952, Section 4785–91, Ohio General Code, was amended so as to exclude the nomination of presidential electors by petition as independent candidates. This section was later repealed, effective January 1, 1954. In its place several new sections were adopted making specific provision for the nomination of certain candidates by petition. None of these sections provided for the nomination of presidential electors by petition.

Under Section 3513.25.9, Ohio Revised Code, the nomination of state officers by petition requires the signatures of qualified voters equal in number to seven percent of the votes cast for governor in the last preceding election. Previously, the number required by Section 4785–91, Ohio General Code, was one percent. Under present Ohio Election Laws there is no provision for nominating presidential electors by petition as independent candidates. Since the voters of a state vote only for presidential electors and not directly for the candidates for president and vice-president, there can be no independent candidates for president and vice-president. To the extent that the Ohio Election Laws prevent this, we deem them to be unconstitutional.

■ At this time there are no candidates for presidential electors in Ohio pledged to vote for George C. Wallace for president in the event of his election. It is proposed to name candidates for electors in the manner stated above. This conforms to neither the party method nor the independent provision for nominating candidates. Under Section 3513.25.8 Ohio Revised Code, a petition for nomination to state office as an independent candidate must be filed ninety days before the primary election rather than ninety days before the general election. This is an unreasonable requirement. The time is now past when petitions for the nomination of independent candidates for presidential electors supporting George C. Wallace could be filed, even ninety days before the November election.

Plaintiffs concede that the State has a legitimate interest in, and a right to, an effective and efficient electoral process, thus giving the State the right to impose reasonable restrictions for legitimate purposes, after due consideration of cost, convenience and administrative burdens. On the other hand defendants have conceded that the Ohio Election Laws, as they now stand, do constitute an impairment, though it was termed "insubstantial", of plaintiffs' right to vote. In this context the judicial focus must

be centered upon ascertaining whether this impairment is constitutionally permissible.

We begin with the principle that

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." Wesberry v. Sanders, 376 U.S. 1, 17–18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481.

Also, it is clear that the right of suffrage is subject only to the imposition of state standards which are not discriminatory. Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L. Ed.2d 169 (1966), and Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The United States Supreme Court has recognized the power of the state to impose reasonable qualifications and restrictions, but has declared that these had to be established on a non-discriminatory basis and that the classifications drawn into the statutes had to be reasonable in light of their purpose. Carrington v. Rash, supra. "We deal here with matters close to the core of our constitutional system." Carrington v. Rash, supra, 380 U.S. at page 96, 85 S. Ct. at page 780. The right to choose that courts have been so zealous to protect means at the least that states may not casually deprive a class of individuals of the vote or the right of an individual to seek political office because of some remote administrative benefit to the state.

The attention of this Court has been centered on whether the Ohio Election Laws, to the extent that these laws prevent the qualification of political parties and their candidates for ballot position, satisfy the tests of "necessity," "equality," and "reasonableness." As evidenced both on the face of these statutes as well as in their operational effect, the restrictions imposed do not meet these tests.

These restrictions are violative of the equal protection clause of the Fourteenth Amendment and are thus constitutionally impermissible.

 We conclude that to the extent that the Ohio Election Laws impose unreasonable restrictions on the qualifications of political third parties, restrict minority participation in Ohio's electoral process, prevent candidates for president and vice-president from qualifying as independents and deprive plaintiffs of their right of suffrage, either by denial of ballot position or effective write-in, they are unconstitutional and void.

 This finding requires consideration of the injunctive relief requested by plaintiffs. As stated above, plaintiffs seek relief in two forms: (1) They ask the Court to order the State of Ohio to place the names of the plaintiffs' candidates on the ballot for the election, and (2) they request the Court to order the State of Ohio to provide a means of casting write-in votes in the election.

With respect to the printing of names on the ballot, the Court decides that such relief shall be denied. We again emphasize that we are confronted with two lawsuits, hastily conceived, and submitted to the Court on the pleadings, briefs and oral arguments. We are asked to go through the Ohio Election Laws, declaring such as we deem inappropriate to plaintiffs' purposes to be unconstitutional and in any event to award them ballot position irrespective of the remaining election laws.

We are expected to hastily decide these cases involving important constitutional questions and grant the relief that should come only from the legislature against a dead line of from two to four weeks. As we have said, it is the function of the state through its legislature to prescribe regulations for qualifying presidential candidates and electors, and for placing their names upon the ballot, as well as all other election requirements. It is suggested that in the exercise of extraordinary equity power we could grant relief to the plaintiffs and order the Secretary

of State to place the names of the respective parties on the ballot.

The Socialist Labor Party has been an organized political party since 1892. It has not had a candidate on the ballot since 1946. The election laws of which it complains have been in effect for fifteen years. It has had ample time to challenge these laws without waiting until the eve of an election and expecting the Court to go through a maze of statutes, declaring some unconstitutional and then usurp the function of the legislature in providing a remedy. Furthermore, as evidenced by affidavit, the Socialist Labor Party is so small that no number of petitioning qualified voters that might be required by the legislature as a reasonable qualification for position on the ballot could be met by it.

George C. Wallace has been a potential candidate for President of the United States for several years. According to the affidavit of defendant Ted W. Brown, Secretary of State and chief election officer of the state, he was first contacted by persons interested in qualifying Mr. Wallace as a candidate for president prior to the 1964 presidential election. At that time, he met with a delegation from Alabama to discuss the statutory requirements for such qualification. Further contacts were had with Mr. Brown as noted in his affidavit.

"Affiant further states that on Saturday, February 18, 1967, at the request of Robert W. Annable, State Coordinator and Director of the Ohio Wallace for President Committee, he met with a delegation for the express purpose of obtaining information relative to filing for a third political party to be named the George Wallace Christian Conservative Party. Affiant states that the records of his office show correspondence with Mr. Robert Annable on March 1 and April 21 concerning the interpretation of Revised Code Section 3517.01. As the result of this correspondence a request was made of the Attorney General on March 13, 1967, resulting in Attorney General's Opinion No. 67–039 made on April 21, 1967; and on March 13 a letter was written to a Mr. Robert Stevenson approving a petition form to be circulated on behalf of the George Wallace American Independent Party as required by Revised Code Section 3519.05.

"Affiant further states that on or about November 10, 1967, he and his staff met with a Mr. James T. Hardin, Chief Attorney, Department of Finance, Legal Division, of the State of Alabama, for a complete review of the statutory requirements in Ohio for the qualification of a third party.

"Affiant further states that his next official contact with persons interested in the formation of the George Wallace American Independent Party occurred on April 20, 1968, when he received the affidavit as required by Section 3517.07 of the Revised Code together with a letter from a Mr. Lewis F. Molnar, State Director of the Ohio Wallace campaign, making a formal request for a place on the 1968 November Ohio ballot for the George Wallace American Independent Party and its Presidential nominee."

Under these circumstances, in waiting until July 29th to bring its action, we do not consider that the Wallace Committee is in position to seek equitable relief even assuming the Court had a right to grant it. We decline to exercise an equitable power, a questionable right at best, to substitute our judgment for that of the legislature with reference to qualifications of candidates for president. This power is given to the legislature by the Constitution of the United States.

Section I, Article II, Constitution of the United States provides:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Prof-

it under the United States, shall be appointed an Elector."

 Without a decision of the Supreme Court of the United States we have no guidelines for formulating specific, definite, wholly unprecedented remedies that we are asked to consider in this litigation stimulated by political rights. We quote with approval the following paragraph from 27 Am.Jur.2d, page 580, Equity Sec. 58:

"It is established general law that courts of equity are without jurisdiction to enforce or protect purely political rights. Thus, a court of equity does not exercise jurisdiction over cases involving political rights; nor will the court protect or assist the individual in the enjoyment or acquisition of such a right. Moreover, a court of equity will not assume power to grant equitable relief where the question of property rights is merely incidental to a political question."

 Should judicial power be exercised with reference to political rights which sometimes are often strongly entangled in popular feeling? Judges before exercising equitable power must have accepted legal standards or criteria or even reliable analogies to draw upon for making judicial judgments. We must avoid federal judicial involvement in matters traditionally and directly left by the United States Constitution to legislative policy making. We should not devise judicial standards to replace legislative determinations of political questions. Federal Courts have consistently refused to exercise their equitable powers, if they have such power, in cases posing political issues and in defining the use of equitable power we believe that as a matter of law and as a matter of procedure that we should not intervene and legislate in matters concerning the structure and organization of the political institutions of the State of Ohio.

 We are involved with a question of "political rights" and not "civil rights" and hence equity could not assume jurisdiction to place the names of candidates on a ballot (Blackman et al. v. Stone et al., D.C., 17 F.Supp. 102). In considering the general powers of a court, a distinction is drawn between jurisdiction of courts of equity and of law based upon a distinction of political and civil rights.

A fundamental characteristic of our national government is its doctrine of separation of powers. Certain powers are reserved to the states and certain powers are delegated to the Federal Government. The Executive, Legislative and Judicial branches of the government were created as separate and independent from each other, each with its own distinct functions and powers. The federal courts, over the years, have zealously guarded the powers entrusted to them by the Constitution. As the judiciary will not permit a trespass on its powers, so it is meticulously careful not to encroach on the legislative branch of the government, either state or national.

The relief requested in relation to write-in voting presents a different question. Here the Court is not asked to establish qualifications for office seekers, but only to effectuate a right protected by the Constitution.

 Therefore, the defendants are hereby permanently enjoined from taking any action which does not provide for write-in voting for all offices for the November 1968 general election and from certifying the election of any presidential elector or federal, state or county officer elected by ballots not containing provision for write-in voting as directed by this Court.

Further, the defendants are hereby ordered to provide for the November, 1968 general election blank spaces on ballots, or other reasonable means in connection with voting machines, to enable a qualified voter to vote for a candidate other than those appearing on the ballot, for every office for which an election is to be held, including the offices of President and Vice-President of the United States, and to count, record, and consider votes so cast equally with others. Any vote for the office of President

and/or Vice-President of the United States, is to be counted and recorded and such votes shall be considered as votes for each of the presidential electors designated by such candidates; provided that votes cast for candidates for these offices who have not provided the Secretary of State of the State of Ohio with a list of the required number of electors prior to October 15, 1968, need not be counted, recorded or considered.

An order may be prepared accordingly.

KINNEARY, District Judge (concurring in part and dissenting in part).

I respectfully dissent from the Decision and Order entered in these actions by the majority members of this Court.

Although the issues presented in these actions have been stated in the majority opinion, I deem it necessary for the purpose of this dissenting opinion, and even at the risk of some repetition, to again state the issues and contentions of the parties made as to the unconstitutionality of the Ohio election laws as this dissenting member sees them.

This Court is confronted with two principal issues: The right of plaintiffs (1) to obtain a position on the Ohio ballot, and, (2) to write in the names of candidates in Ohio elections. Although the majority opinion deals specifically with the political party qualification statute [1] and the write-in statutes,[2] the pleadings in these actions put in issue the constitutionality of the many provisions of Title 35 of the Ohio Revised Code which govern and prescribe the qualification of political parties, the certification of the names of party and independent candidates on the ballot and the conditions and circumstances under which the name of a candidate may be written in on a ballot in a primary and/or a general election.

In both actions plaintiffs' assertions are fundamentally similar. In essence, they are as follows:

(1) The Ohio election laws, and specifically Section 3517.01, impose such prohibitive qualification standards that the Socialist Labor Party and the American Independent Party and their candidates for President and Vice President of the United States and state offices are and will continue to be excluded from the presidential ballot and the state ballot, and that there is a resultant monopoly of political power in Ohio by the Democratic and Republican parties.

(2) The Ohio election laws deny all citizens of the United States the right to become candidates for the offices of President and Vice President of the United States or for presidential electors in Ohio unless they seek office as members of the Democratic or Republican parties, and these laws further deny Ohio electors the right to nominate independent or minority party candidates for these offices unless they are so politically affiliated.

(3) The Ohio election laws are arbitrary, capricious, unreasonable, and discriminatory, and disenfranchise them and preclude them from competing with the Democratic and Republican parties for the votes of Ohio electors.

(4) The Ohio election laws make it virtually impossible for any citizen to get his name on the Ohio presidential ballot or the state office ballot unless he is a member and a candidate of the Democratic and Republican parties.

(5) Only the Democratic and Republican parties are presently recognized as "political parties" under present Ohio law and these parties alone may participate in primary elections. Although Section 3513.14, Ohio Rev.Code, provides for a limited write-in of candidates, there is no provision for write-in of candidates for presidential electors. In general, and for all practical purposes, the election laws deny every group of voters or political organization the right to participate in Ohio primary elections or nominate candidates unless the electors are members of the Democratic or Republican parties in the State of Ohio.

1. Ohio Rev.Code, § 3517.01.

2. Ohio Rev.Code, §§ 3505.03, 3505.04, 3505.10, 3505.23 and 3513.14.

It is necessary to review those sections of the Ohio election laws—past and present—which are directly concerned with and bear upon the constitutional questions involved as I have defined these questions hereinbefore.

Prior to 1948, there were three methods in Ohio by which a candidate for political office and his supporters could participate in the electoral process. *First,* a candidate could have been nominated as an independent candidate by a *nominating petition and obtain a position* on the ballot. *Second,* write-in voting was permitted for those electors whose candidate did not appear by name on the ballot. *Third,* the candidate could have been nominated by a political party in a primary election and obtain a position on the ballot for the general election.

The first method—that of nomination as an independent candidate by nominating petitions—required a candidate to file petitions signed by qualified electors not less in number than one (1) per cent of the voters in the next preceding general election, Gen.Code of Ohio, § 4785–91, not later than sixty (60) days prior to the election. Gen.Code of Ohio, § 4785–92. These provisions applied to candidates for all offices, including those seeking election as presidential electors, Ohio Gen.Code Ann., §§ 4999, 5000; and Gen.Code of Ohio, § 4785–107.

During the fifteen year period prior to 1947, participation in the electoral process by independently nominated candidates was neither substantial nor disruptive.[3] Nevertheless in that year the Ohio General Assembly began a series of changes in the election laws which ultimately resulted in the complete elimination of independent and third party voters and candidates from Ohio's political arena.

Effective January 1, 1948, Section 4785–107 [4] was amended to provide that the presidential ballot would contain only the names of candidates for those offices nominated by national conventions of political parties and the reference to nominees by petition was deleted. Following State ex rel. Beck v. Hummel, 150 Ohio St. 127, 80 N.E.2d 899 (1948), which nullified the effect of that amendment, the Ohio General Assembly amended the provision regulating nomination by petition by excepting candidates for presidential electors from its coverage, effective November 1, 1949. Following this the Ohio General Assembly raised the percentage requirement for nominating petitions of independent candidates for all other state and national offices from one (1) per cent to seven (7) per cent and required that the petitions be filed ninety (90) days before the primary election rather than sixty (60) days before the general election.[5]

Effective January 1, 1952, the second method of participation in the electoral process—that of write-in voting—was foreclosed by statutory enactments banning the write-in vote.[6]

While the Ohio laws relating to qualification as a political party and thus eligibility to participate in the primary election process did not change during the period between 1948–52, the changes that did occur in other statutes focused attention on these sections. The amendments prohibiting nomination by petition of president, vice president, and their electors left only the primary election method open to prospective candidates.

To engage in the primary electoral process a new political party must first comply with Section 3517.01, which defines "political party." In its essential provisions it defines a political party to be: (1) any group of voters which polled ten (10) per cent of the vote in the last preceding election for its candidate for governor, or (2) any group of voters who have filed with the secretary of state, at least ninety (90) days before an election, a petition signed by not fewer than

3. Ohio Election Statistics, Ted W. Brown, 1965–66.

4. Codified as Ohio Rev.Code, § 3505.10.

5. Ohio Rev.Code, §§ 3513.25.7, 3513.25.8.

6. See footnote 2.

fifteen (15) per cent of the total number of voters in the last preceding regular state election. This year the required number of signatures is 433,100. In 1953, 540,766 signatures would have been required.

However, even filing a petition with the number of signatures required by the statute is not sufficient to obtain a position on the ballot for the candidates of a new political party. Inextricably interwoven with Section 3517.01 are many provisions regulating the organization and procedures of political parties in this state. *First*, at the primary election, the new party, or any political party, is required to elect a state central committee consisting of two members from each congressional district and county central committees for each county in Ohio.[7] *Second*, at the primary election the new party must elect delegates and alternates to a national convention.[8] Since Section 3513.19.1, Ohio Rev.Code, prohibits a candidate from seeking the office of delegate to the national convention or committeeman if he voted as a member of a different party at a primary election in the preceding four year period, the new party would be required to have over twelve hundred members who had not previously voted in another party's primary, and who would be willing to serve as committeemen and delegates. *Third*, the candidates for nomination in the primary would have to file petitions signed by qualified electors.[9] The term "qualified electors" is not adequately defined in the Ohio Revised Code,[10] but a related section,[11] provides that a qualified elector at a primary election of a political party is one who, (1) voted for a majority of that party's candidates at the last election, or, (2) has never voted in any election before. Since neither of the political party plaintiffs had any candidates at the last preceding regular state election, they would, of necessity, have to seek out members who had never voted before to sign the nominating petitions, and it would be only these persons who could vote in the primary election of the new party.

The immediate effect—as well as the obvious purpose—of this statutory scheme is the elimination of third party and independent candidates from Ohio elections. The resultant effect is the denial of the right of suffrage to those who would support such candidates. The Ohio legislature—composed entirely of major party members—was eminently successful in erecting a statutory fortress of political party exclusivity. The "two party system" is not a cliche in Ohio, but a statutorily enforced fact.

The concern here is with political rights and not political questions. These rights include the right to vote for presidential electors,[12] the right to choose Senators [13] and Congressmen [14] and the right of persons to form political parties and seek political office.[15]

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). Included in the right to vote is the right to have that vote counted, United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and the right to nominate candidates for public office, State ex rel. Holliday v. O'Leary, 43 Mont. 157, 115 P. 204 (1911). To say that voters are free to vote for nominees, "in the choice of which unwarranted restrictions * * * are imposed," is, indeed, a "hollow mockery." State ex

---

7. Ohio Rev.Code, §§ 3517.02–.04.

8. Ohio Rev.Code, § 3505.10.

9. Ohio Rev.Code, § 3513.05.

10. Ohio Rev.Code, § 3501.01(H).

11. Ohio Rev.Code, § 3513.19.

12. U.S.Const. art. II, § 1.

13. U.S.Const. amend. XVII.

14. U.S.Const. art. I, § 2.

15. U.S.Const. amend. I.

rel. Ragan v. Junkin, 85 Neb. 1, 122 N.W. 473, 475 (1909); and see People ex rel. Hotchkiss v. Smith, 206 N.Y. 231, 99 N.E. 568 (1912), and Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

The right to vote cannot be denied directly, Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), or indirectly, Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); nor can it be denied to "a sector of the population because of the way they may vote." Carrington v. Rash, 380 U.S. 89, 94, 85 S.Ct. 775, 779, 13 L.Ed.2d 675 (1965), and see State ex rel. Beck v. Hummel, 150 Ohio St. 127, 80 N.E.2d 899 (1948).

It cannot be disputed that the State of Ohio has, by its complex statutory scheme, severely limited the right of third party and independent candidates to stand for election to public office and particularly the office of President of the United States. By so doing the State has effectively disenfranchised those who would support such candidates by their votes. Because the right to vote is entitled to protection against "sophisticated as well as simple-minded modes of discrimination," Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), and because "Constitutional rights would be of little value," Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), if they could be "manipulated out of existence," Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the statutory scheme must fall.

While conceding that the state has a legitimate interest in, and a right to, an effective and efficient electoral process, thus giving the state the right to impose reasonable restrictions for legitimate purposes after due consideration of cost, convenience, and administrative burdens, we cannot ignore the principle that:

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right. Wesberry v. Sanders, 376 U.S. 1, 17–18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

It is clear that the right of suffrage is subject only to the imposition of state standards which are not discriminatory. Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The United States Supreme Court has recognized the power of the state to impose *reasonable* qualifications and restrictions, but has declared that these had to be established on a non-discriminatory basis and that the classifications drawn into the statutes had to be reasonable in light of their purpose. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). "We deal here with matters close to the core of our constitutional system." *Carrington*, at 96, 85 S.Ct. at 780. The right to choose that courts have been so zealous to protect means at the least that states may not casually deprive a class of individuals of the vote or the right of an individual to seek political office because of some remote administrative benefit to the state.

The express and unequivocal position taken by the courts is that any restriction on the right to vote must be closely scrutinized to insure that such restrictions are reasonable, non-discriminatory, and necessary. As evidenced both on the face of these statutes as well as in their operational effect, the restrictions imposed by the Ohio election laws do not meet these standards. The scheme of the Ohio legislature—to monopolize political power in the two major political parties—is plain. Not content with passing a series of laws which make it virtually impossible for third party candidates to place their names on the ballot, the Ohio General Assembly at the same time enacted statutes which effectively banned write-in voting, so as to insure

the complete elimination of the right to vote for any candidate other than those offered by the two major parties. The history of the limited participation of minority parties in the past, and the lack of any showing of an administrative burden or necessity is a clear indication that the denial of the right to write in the name of the candidate of one's choice, when coupled with the effective denial of ballot position, amounts to an intentional denial of the plaintiffs' constitutionally protected right to vote. This denial is as much a denial of the plaintiffs' right to vote as those which the Supreme Court struck down in Gomillion v. Lightfoot,[16] Smith v. Allwright,[17] Baker v. Carr,[18] and Carrington v. Rash.[19] These restrictions on the availability of ballot position and the denial of the write-in vote are violative of the equal protection clause of the Fourteenth Amendment and are thus constitutionally impermissible.

Having shown that the Ohio election laws, insofar as they prevent the qualification of new political parties, prohibit minority participation in the electoral process, and deprive plaintiffs and the class they represent of their right of suffrage, are unconstitutional and void, the plaintiffs are entitled to immediate equitable relief. In such a case, the Supreme Court demands that relief be provided.

> It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. Reynolds v. Sims, 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964).

If the duty to provide relief is imposed in a reapportionment case which involves the dilution of the value of a vote, the duty is even more compellingly imposed in these cases which involve the outright denial of the right to vote.

There can be no doubt about the power of this Court to provide the necessary remedy. The recent reapportionment, school desegregation and voter discrimination cases, Reynolds v. Sims, supra; Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); United States v. Duke, 332 F.2d 759 (5th Cir. 1964), *inter alia*, illustrate the broad range of relief which a federal court may fashion when there has been a denial of a constitutionally protected right.

Nor do these actions present "the unusual case" referred to in *Reynolds*. The forthcoming election is not so imminent as to prevent the placing of another name on the Presidential ballot. Nor will the mechanics and complexities of the state's electoral process be disrupted. Indeed, present Ohio law provides for changes on ballots as late as ten (10) days before an election.[20]

The Socialist Labor Party is a political organization of adequate form, but no substance. While it has existed in Ohio for many years and has nominated candidates for public office in prior elections, it is not presently composed of any remotely substantial group of electors. Upon facts established in the Socialist action, it appears that in 1966 this party could claim a membership of only one hundred eight (108) persons. Even under constitutionally permissible standards this party could not demand ballot position. For this reason I would deny the Socialist Labor Party ballot position for the forthcoming election. I concur in the relief afforded these plaintiffs as limited to write-in voting.

On the other hand, the Wallace organization has secured in excess of 450,000 signatures of Ohio electors who seek to place the Wallace American Independ-

---

16. 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

17. 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1949).

18. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

19. 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed. 2d 675 (1965).

20. Ohio Rev.Code, § 3505.01.

ent Party and its candidates on the Presidential ballot in the forthcoming election.

Even allowing for the usual percentage of invalid signatures, such a substantial group of Ohio electors cannot be turned away with the remedy of write-in voting. This Court should not relegate the thousands of people in this group to the status of second class electors by saying to them: "Your choice may be written in, but your choice may not be on the ballot." This is not equal opportunity.

Clearly, it is not the function of this Court to inquire into or consider how, when and by what means a political organization was formed. We are not concerned with the political objectives of the Wallace American Independent Party or its life expectancy. Rather we are concerned only with the right of several hundred thousand electors to participate in Ohio's electoral process on a basis of complete equality with the members of the two major parties. This equality—and there can be no doubt that this equality is guaranteed under the United States Constitution—is not satisfied with write-in voting; it plainly requires ballot position for this party and its candidates.