Sallie M. HADNOTT et al., Plaintiffs,

v.

Mabel S. AMOS, as Secretary of State of the State of Alabama, et al., Defendants.

Civ. A. No. 2757-N.

United States District Court
M. D. Alabama, N. D.

Oct. 11, 1968.

See also D.C., 291 F.Supp. 309.

Charles Morgan, Jr., and Reber F. Boult, Jr., Atlanta, Ga., Orzell Billingsley, Jr., Birmingham, Ala. and Melvin L. Wulf and Eleanor Norton, New York City, for plaintiffs.

MacDonald Gallion, Atty. Gen., State of Alabama, John G. Bookout, Deputy Atty. Gen., William N. McQueen, Leslie Hall, and Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., and L. Drew Redden, Rogers, Howard, Redden & Mills, Birmingham, Ala., Sp. Asst. Atty. Gen., for defendants.

R. Clifford Fulford, Levine, Fulford, Gwaltney & Pope, Birmingham, Ala., for intervening defendant, Edward F. Mauldin, as Chairman of Alabama Citizens for Humphrey-Muskie, an unincorporated association, in behalf of himself and all other persons similarly situated and interested.

Before GODBOLD, Circuit Judge, and JOHNSON and PITTMAN, District Judges.

PER CURIAM:

This suit is an effort to secure places for more than 100 candidates of the National Democratic Party of Alabama (NDPA) on the ballots to be used in the general election to be held in Alabama on November 5, 1968. Numerous provisions of the election laws of Alabama are challenged as unconstitutional on their faces, applied in an unconstitutional manner, and in conflict with the Voting Rights Act of 1965, 42 U.S.C.A. § 1973–73p. A three-judge district court has been convened under 28 U.S.C.A. § 2281. Notice of suit has been given to the Attorney General and Governor of Alabama, 28 U.S.C.A. § 2284(2).

We hold that the plaintiffs properly bring this suit as a class action, and that the defendant Edward A. Grouby properly represents a class of defendants composed of the Judges of Probate of all counties in Alabama. The plaintiffs' motion to file a second amendment to their complaint is granted.

To minimize the difficult problems which this controversy creates for public

officials, candidates, and voters and to protect the interests of all insofar as possible this court entered a temporary restraining order on September 18, 1968, which is still in effect, directing that the NDPA candidates be certified by the Secretary of State as candidates, or included as candidates by Judges of Probate, as appropriate for the particular office sought.[1] The case is now submitted to us for decision on the application for a temporary injunction and on the merits for a final decree. We have considered the pleadings, many depositions of witnesses, voluminous documents, and other evidence, numerous briefs, and oral arguments by counsel.

1

This court, acting through a single judge, and through three judges, has not been reluctant to protect constitutional rights relating to the voting process.[2] Once this three-judge court acquired jurisdiction of the present case by reason of an injunction being sought against enforcement of state statutes on substantial federal constitutional grounds, we acquired jurisdiction over all the claims raised in the case, state and federal.[3] But it does not follow that because a constiutional issue concerning voting or elections is properly presented to the court it necessarily should decide every contention and issue not of a federal constitutional nature which all the parties may raise about the election. This court, exercising its discretion, decides only the substantial issues concerning the Constitution of the United States. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. The Corrupt Practices Law

Plaintiffs attack as unconstitutional on the face and as applied to them and their class the provisions of Tit. 17 §§ 274–275, Ala.Code (1958).[4] These sec-

---

1. In Alabama ballots are printed by each county for use in that county only, under the supervision of the county Judge of Probate. He must cause to be printed upon the ballot the names of all candidates who have been put in nomination and certified to him not less than 60 days previous to the day of election. Certificates of nomination for persons to be voted on state-wide, or by an entire Congressional district, judicial circuit or senatorial district, for any state or federal office, must be filed with the Secretary of State, who certifies to the Judges of Probate of the respective counties affected the names of such nominees and the offices for which nominated. Certificates of nomination for offices to be voted on by a single county are filed directly with the Judge of Probate of the county. Ala. Code (1958), Tit. 17, §§ 145, 168.

2. E. g., United States v. Alabama, 252 F. Supp. 95 (M.D.Ala.1966) (three-judge court); Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965) (three-judge court); United States v. Parker, 236 F.Supp. 511 (M.D.Ala. 1964); United States v. Cartwright, 230 F.Supp. 873 (M.D.Ala.1964); United States v. Penton, 212 F.Supp. 193 (M.D.Ala.1962); Sellers v. Wilson, 123 F.Supp. 917 (M.D.Ala.1954).

3. E. g., Florida Lime & Avocado Growers, Inc. v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960).

4. "§ 274. *Committee to receive, expend, audit and disburse money or funds contributed.*—Within five days after the announcement of his candidacy for any office, each candidate for a state office shall file with the secretary of state and each candidate for a county office or the state house of representatives shall file with the judge of probate of the county, and each candidate for a circuit or district office, including the state senate, shall file with the judge of probate of each county which is embodied in said circuit or district, a statement showing the name of not less than one nor more than five persons elected to receive, expend, audit, and disburse all moneys contributed, donated, subscribed, or in any way furnished or raised for the purpose of aiding or promoting the nomination or election of such candidate, together with a written acceptance or consent of such persons to act as such committee, but any candidate, if he sees fit to do so, may declare himself as the person chosen for such purpose. If the statement required herein shall have been postmarked at any United States post office not later than midnight of the fifth day after the announcement of his candidacy, the candidate shall be deemed to have complied with the requirements of this section as to filing such statement within five days after the announcement of his candidacy. Such com-

tions are part of a comprehensive state Corrupt Practices Law enacted by the Alabama legislature in 1915. Section 272 establishes the maximum amounts that various candidates may spend in their races. Section 277 requires that contributions made for or on behalf of the candidate be made to the committee named under § 274. Under § 279 the Committee must, within 30 days after the election, file (with the Secretary of State or the Judge of Probate, depending on the office sought) an itemized sworn statement of expenditures and contributions. Under § 281 these are public documents, open to inspection by any citizens. If the post-election statement is not made the candidate may not be certified as nominated or elected even though otherwise successful. Tit. 17, § 281.

■ The state has a legitimate interest in seeking to supervise spending in political campaigns. We have no illusions about the Corrupt Practices Law working perfectly. The proliferation of committees other than those named by the candidate himself is a fact of political life in Alabama. But the requirement that the candidate himself designate a committee is an appropriate and reasonable means by which the state may seek to achieve a legitimate end.[5]

■ Plaintiffs claim that disqualification of the candidate is an excessively harsh penalty for violation of § 274, and therefore an unconstitutional deprivation of due process of law, because less drastic alternatives are available, citing Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Section 275 provides for two penalties when the candidate fails to designate his finance committee—the failure is declared a corrupt practice, and his name "shall not be allowed to go upon the ballot." One guilty of a corrupt practice is guilty of a misdemeanor and must be fined not more than $500 and also may be imprisoned at hard labor for not more than six months. Tit. 17, § 332. Disqualification of the candidate is a direct and readily available means of securing compliance. But the remedy of refusing the candidate a place on the ballot has been employed repeatedly.[6] We cannot accept the argument of plain-

mittees shall appoint one of their number to act as treasurer, who shall receive and disburse all moneys received by said committee; he shall keep detailed account of receipts, payments and liabilities. The said committee or its treasurer shall have the exclusive custody of all moneys contributed, donated, subscribed, or in any wise furnished for or on behalf of the candidate represented by said committee, and shall disburse the same on proper vouchers. If any vacancies be created by death or resignation or any other cause on said committees, said candidate may fill such vacancies, or the remaining members shall discharge and complete the duties required of said committee as if such a vacancy had not been created. No candidate for nomination or election shall expend any money directly or indirectly in aid of his nomination or election except by contributing to the committee designated by him as aforesaid. (1915, p. 250; 1959, p. 1036, appvd. Nov. 13, 1959.)

"§ 275. *Candidate acting as own committee.*—Any person who shall act as his own committee shall be governed by the provisions of this article relating to com-

mittees designated by candidates. Failure to make the declaration of appointment or selection by any candidate as herein required is declared to be a corrupt practice, and in addition the name of such candidate so failing shall not be allowed to go upon the ballot at such election. (1915, p. 250.)"

5. In Bottomly, John S., Corrupt Practices in Political Campaigns, 30 Boston Univ. L.Rev. 331 (1950) the corrupt practices statutes of most of the states were tabulated. At that time 36 states authorized non-criminal sanctions of denial of a place on the ballot or disqualification for or denial of the office, for various violations of their corrupt practices statutes. Eleven states are shown as authorizing denial of a place on the ballot.

6. E. g., Herndon v. Lee, 281 Ala. 61, 199 So.2d 74 (1967); Jones v. Phillips, 279 Ala. 354, 185 So.2d 378 (1966); Owens v. Heartsill, 279 Ala. 359, 185 So.2d 382 (1966); cf. McCutcheon v. Thomas, 261 Ala. 688, 75 So.2d 649 (1954); Rep. of Atty.Gen. of Ala., 1934–36, p. 611.

tiffs that a criminal penalty is an alternative so much more desirable that it renders unconstitutional the remedy of denial of a place on the ballot, or that alone it is even an effective alternative. The undesirability of criminal action as the sole remedy is shown by the present case. The great majority of the NDPA candidates seek relatively minor local offices, are candidates for the first time, and are claimed to be in most instances unfamiliar with election laws and of procedures required of them, and in some instances unaware of their nominations. The suggestion that all of them are to be exposed to criminal action is not tenable.

 Nor can we accept the contention that it is constitutionally impermissible to enforce the penalty of denial of a place on the ballot unless the candidate is guilty of fraud or intent to defraud. This misconceives the purpose and effect of the finance committee requirements, which provide for a publicly designated agency through whose hands funds are received, disbursed and audited and whose statements are filed and open for public inspection. The emphasis is on the spotlight of available public scrutiny.[7]

The Alabama courts uniformly, though at times reluctantly,[8] have enforced violations of §§ 274–275 as mandatory if raised in a direct proceeding prior to the election. Herndon v. Lee, supra; Jones v. Phillips, supra; Owens v. Heartsill, supra; cf. Garrett v. Cuninghame, 211 Ala. 430, 100 So. 845 (1924), though only directory if raised after the election. Section 275 has not been amended since its enactment in 1915. Both sections were reenacted in 1940. Section 274 was amended in 1959 to clarify the filing of committee designations by candidates for the state legislature and the measurement of the five-day period. The mandatory penalty was not changed. "This [the requirement of filing the appointment of a finance committee] was just as much a part of his qualification as a candidate as was the paying of his qualification fee to the proper chairman of his party." Jones v. Phillips, 185 So.2d at 380.

 When the Secretary of State declined to certify to the Judges of Probate NDPA candidates who filed nominations in her office she did not assert failure to comply with the Act as one of her motivations. Her motivation is irrelevant to a judicial determination of whether the Act is constitutional on its face.

 The court holds that §§ 274–275 are not unconstitutional on their faces.

No unconstitutional application of the Corrupt Practices Law by selective enforcement has been proved with respect to the NDPA candidates, for filings with the Secretary of State or filings with the Judges of Probate. Selective enforcement could arise from back-dating committee designations filed late or from failure by the Secretary of State or the Judges of Probate to deny certification or a place on the ballot to candidates other than the plaintiffs' class who either did not file or filed late. As to the former, there is no evidence of any practice in the offices of the Secretary of State or any one of the 67 Judges of Probate of accepting late filings as timely. The evidence as to the Secretary of State is that filing dates are carefully watched and late, filings not accepted.

As to the latter—selective application of the penalty—we are asked to infer that there is enforcement with an uneven hand by the fact that in this lawsuit the defendant state officers assert that members of the plaintiff class are not entitled to a place on the ballot because of failure to comply with § 274. This misconceives both the duties of this

---

7. In Jones v. Phillips, supra, the Alabama Supreme Court noted that "corrupt" as used in the Corrupt Practices Act did not brand the candidate who failed to comply as personally corrupt in the generic sense of evil or fraudulent. Accord, Vickery v. King, 281 Ala. 303, 202 So.2d 148 (1967).

8. See Jones v. Phillips, 185 So.2d at 381.

court and the facts. The plaintiffs seek an affirmative injunctive order requiring that their class be put on the ballot. As a prerequisite to that relief at the hands of the court they must show that they are qualified to be on the ballot. From the beginning this court has made it clear that if it, rather than state officers, was to be an instrumentality for placing names on the ballot, then in the discharge of that duty it wanted to order no names put on—if it ordered any—except those of qualified candidates. The actions of the parties are not the measure of the court's own obligation to enforce laws, if valid, that are for the benefit not of the parties or a few public officers but of the public at large.[9]

■ Turning to the facts, designations of finance committees are filed with the Secretary of State or with Judges of Probate.[10] There is no substantial evidence of lack of compliance by other candidates with §§ 274–275 in this or any other election, nor of any custom or practice by state officers at state or county level, of not acting thereon. All, or most, of the handful of reported cases in the Alabama Supreme Court are suits brought by candidates or voters to force the publc officer concerned to deny a place on the ballot to a non-complying candidate. But the extent of enforcement, or lack of enforcement, by routine administrative action which reaches neither courts nor newspapers, or by legal action in the circuit courts, is not proved, either as to the office of the Secretary of State or as to any one or more of the 67 Judges of Probate. There

is no evidence of practice, consistent or otherwise, or that this is the first time the Corrupt Practices Law has been invoked at either state or county level.[10a] We cannot infer selective enforcement under these circumstances. We cannot find a law unconstitutional on the presumption, unproved assumption, or guess, with respect to other noncomplying candidates, in this or other years, that the Secretary of State and the Judges of Probate have followed a consistent practice of not performing their duties.

■ The requirements of §§ 274–275 do not violate the Voting Rights Act of 1965, 42 U.S.C.A. § 1973. The requirement of designating a finance committee is not a "test or device" prerequisite for voting or registration under § 1973b. We need not decide whether it is a "standard, practice, or procedure with respect to voting" under § 1973c, because it was in existence before November 1, 1964.[11]

Therefore, the court declares that §§ 274 and 275 of Tit. 17 are not unconstitutional on their faces, are not proved to be unconstitutional in their application, and are not violative of the Voting Rights Act of 1965.

### 3. The Constitutionality of the Garrett Act

The Garrett Act, Act No. 243 of the Alabama legislature, 1967 Special Session, adopted May 11, 1967, prohibits the Secretary of State (for state, district and federal offices) from certifying and the Judge of Probate (for county offices) from causing to be printed on the ballots for a general election the name

---

9. To that end at the hearing on temporary restraining order the court directed defense counsel to notify plaintiffs' counsel of any reasons other than those raised in this suit and known to the defendants why any members of the plaintiffs' class did not qualify for the offices sought.

10. The offices sought by a great majority of the NDPA candidates are such that they deal with Judges of Probate in election matters, including filing in the appropriate county probate offices the designations of finance committees. The Secretary of State is a candidate for pres-

idential elector, which causes us to examine her acts with unusually careful scrutiny. The Judges of Probate are not such candidates.

10a. The Reports of the Attorney General of Alabama reveal that from time to time Judges of Probate have sought his official opinion with respect to non-compliance and putting names on the ballot. Rep. of Att'y.Gen. of Ala. 1934–36, p. 611; Jan.-Mar. 1940, at 360.

11. See cases cited in text at note 14, infra.

of a candidate who does not file a declaration of intention to become a candidate for such office on or before the first day of March of the year in which the general election is held. If the declarant is a candidate for nomination by a political party he must designate the party whose nomination he seeks; otherwise he must state that he will be an independent candidate for the office.

The requirement of the statement of intent must be viewed in context as a part of the complete Alabama electoral process.

Alabama provides for nomination of candidates to run in the general election by primary, party convention, mass meetings, and petitions. Also the ballot in the general election is required to provide space for write-in ballots for any other persons for whom the voters desire to cast ballots. Tit. 17, § 155.[11a]

The first Tuesday in May is a key date in all the processes of nomination for which Alabama law provides. Primary elections are held on the first Tuesday in May. Tit. 17, § 340.[12] If a party nominates by mass meeting it must hold its meeting on the first Tuesday in May at or in the vicinity of a polling place. Tit. 17, §§ 413–414. One nominated by petition must file his petition with the Secretary of State or Judge of Probate, as appropriate, before the first Tuesday in May. Tit. 17, § 145. Delegates to the convention of a party which will nominate by convention are chosen at meetings on the first Tuesday in May. Tit. 17, §§ 413–414.

One desiring to be a candidate in the primary must file his declaration of candidacy with his party by March 1.

Tit. 17, § 348. This keys in with the requirement of §§ 336–337, referred to above, that a party which by reason of its voting strength is within the primary law must act by 60 days before the first Tuesday in May if it wishes to use another method of nomination.

Prior to the Garrett Act there necessarily was considerable prenomination activity before the first Tuesday in May, which required or tended to require commitment of intent before that date though not necessarily on the same day and not in all instances as early as March 1. The candidate who sought nomination by primary declared with his party by March 1 and historically was campaigning until early May. Those seeking nomination by mass meetings would have to seek support for votes also to be cast on the first Tuesday in May but cast in a mass meeting rather than by a primary ballot, and one seeking nomination by petition would have to obtain the required signatures in order to file the petition on time. And the person seeking nomination by convention would have to find, and elicit support for, favorable delegates who would be chosen at mass meetings held on the first Tuesday in May.

The Garrett Act adds to this nominating system the requirement that all candidates state their intent by March 1, by filing a statement of intent (except for one seeking nomination by primary, and his declaration with his party serves in lieu of the statement of intent).

The Alabama electoral system does not reserve the ballot for established major parties and exclude minor ones. There are seven parties on the November general election ballot.[13] This general elec-

---

11a. None of these procedures is new, all having been in effect for many years.

12. A party which cast more than twenty per cent of the vote in the last general election in the state, or in the county, must hold a state, or county, primary unless it files with the Secretary of State its election not to do so at least 60 days before the date of the primary. A choice so made may not be changed until after the next general election. Tit. 17, § 336–337.

13. Alphabetically they are: Alabama Independent Democratic Party, American Independent Party of Alabama, Democratic Party, Prohibition Party, Republican Party, The Alabama Conservative Party, The National Democratic Party of Alabama. Five are running full slates of ten candidates for presidential electors. One is running a partial slate.

tion ballot is neither unique nor even unusual. No certain number of persons is required to constitute a party. No particular formality of organization is required. There need not be a statewide organization or affiliation with a national party or national convention. To be nominated by petition as an independent candidate for a state or federal office one needs only 300 signatures, for a county or municipal office only 25 signatures. Tit. 17, § 145.

Thus the Garrett Act is not a part of a pervasive system or scheme to keep minor parties and independents off the ballot and reserve the political domain for the two major parties.

There is no evidence that enactment of the Garrett Act was in any degree racially motivated or directed at NDPA. The only evidence before us tends to show what is generally accepted as the reason for its enactment, that it was intended to correct what the legislature viewed as an inequity against a party nominating by primary (presently only the Democratic Party statewide; there are Republican primaries in some counties), arising from the fact that parties nominating by other methods could hold back deciding upon candidates and selectively choose and place their candidates against the nominees or potential nominees by primary who appear most vulnerable.

Viewed in the framework of the total Alabama electoral system the establishment of a fixed time of March 1, 60 plus days from May 7, for all candidates to commit themselves is not constitutionally impermissible. Certainly there is no constitutional right vested in voters or candidates that all parties and candidates begin the formal electoral process with the same starter's gun. But there is no constitutional prohibition against a state legislature's requiring by reasonable means, as an incident to what it deems fair, orderly and effective election machinery, that all candidates must begin the formal election process by a fixed date.

Plaintiffs appear to contend that time alone is an independent vice which makes March 1 a constitutionally impermissible date, bearing in mind especially the length of time from March 1 until November. If time were unrelated to orderly, fair, and nonexclusory nominating procedures, or were a part of an overall exclusory system or scheme, the argument would have more force. Plaintiffs rely on Williams v. Rhodes and Socialist Labor Party v. Rhodes (S.D. Ohio, Aug. 29, 1968), 290 F.Supp. 983 decided by a three-judge district court in Ohio on August 29, 1968, argued to the Supreme Court on October 7, 1968. Those cases were concerned with Ohio election laws. By a series of legislative enactments Ohio had changed its previous election laws (allowing nomination by primary and by petition, and allowing write-in votes) so as to effectively eliminate from its electoral processes all minority parties and independent candidates and also abolished write-in ballots, thereby keeping the political arena for the Democratic and Republican parties. Only presidential electors were involved. In connection with its discussion of the impossibility of qualifying independent candidates for presidential electors, and against the backdrop of impossibility of getting a minority party on the ballot, the court described as unreasonable the requirement that a petition for nomination to state office as an independent must be filed 90 days before the primary election. The time element was a part of an overall system, exclusory in purpose and exclusory in effect.

Those political groups in Alabama more formally and more permanently organized and familiar with election procedures will find compliance with the statement of intent law easier than those who are not. But this difference alone presents no constitutional infirmity. The same problem will exist with regard to any requirements of the election laws regardless of the details of the electoral machinery provided by the state.

Some of the advantages of early and clear-cut declarations of intent are demonstrated by this case, especially in view of the time problem of sending absentee ballots to persons in the military service. When this suit was filed there still was widespread confusion over which offices some of the NDPA candidates were seeking and whether some of them could qualify for those offices for reasons unrelated to this suit. As a result of the initial hearing before this court on issuance of a temporary restraining order a number of NDPA candidates were conceded to be not qualified and were dropped as claimants for places on the ballots. The uncertainties have been reduced but not eliminated.[14] The state and the voters have an interest in a procedure which properly observed may tend to filter out some of the mistakes, pitfalls and misunderstandings early rather than late.

 The Garrett Act is not a "voting qualification or prerequisite to voting" or a "standard, practice or procedure with respect to voting" within the meaning of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973c. See Whitley v. Johnson, 12 Race Rel.L.Rep. 2031 (S. D.Miss.1967) (three-judge court); Bunton v. Patterson, 281 F.Supp. 918 (S.D. Miss.1967); Fairley v. Patterson, 282 F. Supp. 164 (S.D.Miss.1967).[15] Compare Sellers v. Trussell, 253 F.Supp. 915 (M. D.Ala.1966) (three-judge court).

Therefore, the Court declares that the Garrett Act, Act No. 243 of the Alabama Legislature, 1967 Special Session, is not unconstitutional on its face, is not proved to be unconstitutionally applied, and is not in violation of the Voting Rights Act of 1965.

4. The disqualification of candidates by the Secretary of State on the ground of failure to conduct a mass meeting in Huntsville.

The Secretary of State declined to certify to the Judges of Probate the names of most of the NDPA candidates required to be voted on by the entire state, or by a congressional district, judicial circuit or senatorial district. Her asserted grounds were two, failure to comply with the Garrett Act, which we have dealt with above, and the possession by her of information indicating that NDPA had not held a mass meeting in Huntsville May 7, 1968. (Huntsville was one of many places throughout the state at which NDPA was seeking to hold mass meetings on May 7.) The information consisted of a letter from two residents of Huntsville who had no personal knowledge of whether the mass meeting was held, accompanied by affidavits of two persons containing "evidence" of the most slender nature, largely circumstantial and in part hearsay, attempting to negative the certification that the meeting had been held.

The matter furnished the Secretary of State authorized her to make inquiry to ascertain if the statute had been complied with. Kinney v. House, 243 Ala. 393, 10 So.2d 167 (1942); Report of Attorney General of Alabama, 1934–36, at 4. Instead she directed NDPA to show cause why it should not be removed from the ballot, and, after it had filed various supplemental data, declined to certify its candidates, with two exceptions.[16]

 The refusal to certify candidates on the basis of the letter and af-

---

14. The NDPA leadership knew of the requirements of the Garrett Act prior to March 1, 1968, and advised party members of the necessity of compliance. The NDPA state headquarters notified county chairmen to have members file statements of intent. Some did and some did not. NDPA was advised by counsel, and its counsel either obtained or prepared for NDPA use statement of intent forms (which included designation of a finance committee) which were distributed to

party representatives throughout the state.

15. These cases have been consolidated and set for argument before the Supreme Court, with questions of jurisdiction postponed until the hearing on the merits. 392 U.S. 902, 88 S.Ct. 2052, 20 L.Ed.2d 1361 (1968).

16. Why there were two exceptions is not made clear to this court.

fidavits was a violation of basic principles of equal protection, due process and essential fairness. This is so with regard to candidates certified as nominated at the Huntsville meeting and those nominated at the state convention as well. The same documents were, along with failure to file statements of intent, the basis for the refusal of the Secretary of State to certify candidates nominated at the state conventions of NDPA, held on July 20, 1968.

We do not decide the complex factual issues of whether mass meetings, including the Huntsville meeting, were held and whether candidates purportedly nominated at such meetings were validly certified. We do hold that the action of the Secretary of State in denying certification to NDPA candidates, insofar as it was based on alleged failure to hold the Huntsville meeting, was unconstitutional. We also hold that the alleged failure to hold the Huntsville meeting cannot be the basis for any Judge of Probate denying a place on the ballot to any NDPA candidate, if the only evidence supporting such basis is the letter and affidavits above described. Those documents do no more than give cause for inquiry by Judges of Probate or the Secretary of State as the case may be. They may not alone be the cause of denial of a place on the ballot.

5

■ We find no merit in the claims that Tit. 17, § 148, providing that the name of a candidate may appear on the ballot only one time and under one party emblem, is unconstitutional and in violation of the Voting Rights Act of 1965. Nor do we find any constitutional infirmity in Tit. 17, § 125, relating to appointment, under designated circumstances, of election officials from the two political parties having received the highest number of votes at the last election.

6

■ The Attorney General and the Secretary of State have duties with respect to the general election, and they and the Governor have duties regarding the vote of persons elected as presidential electors. These three state officers are candidates for presidential electors. Plaintiffs claim that a situation of adverse interest is created which violates the Constitution of the United States and § 280 of the Constitution of Alabama, which forbids the holding of two state offices for profit at the same time. We perceive no violation of the United States Constitution. The office of presidential elector is a state office. Ray v. Blair, 343 U.S. 214, 72 S.Ct. 654, 96 L. Ed. 894 (1952); In re Green, 134 U.S. 377, 10 S.Ct. 586, 33 L.Ed. 951 (1890); Walker v. United States, 93 F.2d 383 (8th Cir.), cert. denied, 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103 (1938). Whether § 280 of the Alabama Constitution has been infringed is a matter of state law.

Having disposed of the substantial federal constitutional questions we decline to decide the various factual disputes of the parties which do not relate to those federal constitutional questions, and the various issues purely of state law.

Pursuant to Rule 52, Fed.R.Civ.P., this opinion constitutes the findings of fact and conclusions of law of the court. Judgment will be entered accordingly.

### DECREE

The court having entered its memorandum opinion containing its findings of fact and conclusions of law, it is, therefore,

Considered, ordered, adjudged and decreed as follows:

1. Tit. 17, §§ 274–275, Code of Ala. (1958), a part of the Alabama Corrupt Practices Law, is not unconstitutional on its face, has not been proved to be unconstitutionally applied, and does not

violate the provisions of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973–73p.

2. The Garrett Act, Act No. 243 of the Alabama legislature, 1967 Special Session, is not unconstitutional on its face, has not been proved to be unconstitutionally applied, and does not violate the provisions of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973–73p.

3. The refusal by Mabel S. Amos, Secretary of State of the State of Alabama, to certify NDPA candidates insofar as it was based upon the letter and the affidavits described in the opinion of the court, was a violation of equal protection of the laws and of due process, as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

4. The alleged failure of NDPA to hold a mass meeting in Huntsville, Alabama, on May 7, 1968, may not be the basis for any Judge of Probate denying a place on the ballot to any NDPA candidate, if the only evidence supporting such basis is the letter and affidavits described in the opinion of the court.

5. Tit. 17, § 125, Code of Ala. (1958), is not unconstitutional on its face, is not proved to be unconstitutionally applied, and is not in violation of the Voting Rights Act of 1965, 42 U.S.C.A. § 1973–73p.

6. Tit. 17, § 148, Code of Ala. (1958), is not unconstitutional on its face, is not proved to be applied in an unconstitutional manner, and does not violate the Voting Rights Act of 1965.

7. The prayers for temporary and permanent injunctions are denied. The temporary restraining order entered on September 18, 1968, is dissolved.

Costs are taxed one-half against the plaintiffs and one-half against the defendant Mabel S. Amos, Secretary of State of the State of Alabama.

JOHNSON, District Judge (dissenting).

I must respectfully dissent from the majority's holdings that the Corrupt Practices Law was not applied unconstitutionally to the NDPA in this case and that the Garrett Law is constitutional on its face, and, therefore, from the conclusion that some or all of the NDPA candidates are not entitled to a place on the November ballot.

## I. THE CORRUPT PRACTICES LAW

I fully concur in the majority's holding that the Alabama Corrupt Practices Law is constitutional on its face. The law is a reasonable approach to a difficult problem. Although disqualification of the candidate for noncompliance is a drastic remedy, the legislature might well conclude that such a remedy is necessary to foster voluntary compliance.

The best of laws, however, can be invoked in an unworthy manner. Here, it was invoked strictly as an afterthought. As the majority concedes:

"When the Secretary of State declined to certify to the Judges of Probate NDPA candidates who filed nominations in her office she did not assert failure to comply with the Act as one of her motivations. Her motivation is irrelevant to a judicial determination of whether the Act is constitutional *on its face*." (Emphasis added.)

The Corrupt Practices Act has not fallen into disuse. Nor, as the cases cited by the majority indicate, has the remedy of disqualification. In all those cases, however, the Act was invoked by opposing candidates or by concerned voters. Alabama State officials having adopted a consistent practice of relying on party and public policing and enforcement of this Act, it is not tolerable for this Court to allow these officials to make their first foray in the enforcement direction against a small, new, and almost surely impecunious group of candidates seeking to form a new party in Alabama. This is particularly true when the defendant officials who are taking such action are candidates for presidential electors on the ballot of an opposing party. Whether or not a formal conflict of interest, this circumstance, when conjoined with those above, justifies the inference that the

Corrupt Practices Act, fair on its face, has been:

"applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances * * *." Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886).

In this vital area of the right to vote and to run for office, the courts must not hesitate to exercise their judicial duty to ensure an evenhanded application of the Alabama election laws.

## II. THE GARRETT LAW

The Garrett Law requires that candidates for office file a declaration of intention to run on or before the first day of March of the year in which the general election is held.

Although a state might reasonably require a candidate to file sufficiently in advance of the election to permit administrative preparations, defendants do not contend that such a purpose *would require eight months' notice*. Indeed, as the majority recites, it is generally accepted that the Garrett Law:

"was intended to correct what the legislature viewed as an inequity against a party nominating by primary (presently only the Democratic Party), arising from the fact that parties nominating by other methods could hold back deciding upon candidates and selectively choose and place their candidates against the nominees or potential nominees by primary who appear most vulnerable."

Protection of one political party from another political party is not a permissible object of legislation. Even if it be thought permissible, it would scarcely justify the adverse impact which this statute has on the right to an effective vote for the candidate of one's choice. Here, the process of choice of candidates is cut off at an unreasonably early date.

The candidates who seek relief from this Court find themselves in almost precisely the situation George C. Wallace found himself in by reason of an Ohio law that required a petition for nomination to state office presidential electors) be filed at least 90 days before the primary election rather than the general election. In an action by these Wallace electors a three-judge Federal Court sitting in the Southern District of Ohio,[1] stated:

"This is an unreasonable requirement. The time is now past when petitions for the nomination of independent candidates for presidential electors supporting George C. Wallace could be filed, even ninety days before the November election.

"Plaintiffs concede that the State has a legitimate interest in, and a right to, an effective and efficient electoral process, thus giving the State the right to impose reasonable restrictions for legitimate purposes, after due consideration of cost, convenience and administrative burdens. On the other hand defendants have conceded that the Ohio Election Laws, as they now stand, do constitute an impairment, though it was termed 'insubstantial', of plaintiffs' right to vote. In this context the judicial focus must be centered upon ascertaining whether this impairment is constitutionally permissible.

"We begin with the principle that "'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges that right.' Wesberry v. Sanders, 376 U.S. 1, 17–18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481.

Also, it is clear that the right of suffrage is subject only to the imposi-

1. Socialist Labor Party et al. v. Rhodes et al., U.S.D.C. S.D.Ohio, 290 F.Supp. 983 and filed August 29, 1968.

tion of state standards which are not discriminatory. Harper v. Virginia [State] Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). The United States Supreme Court has recognized the power of the state to impose reasonable qualifications and restrictions, but has declared that these had to be established on a non-discriminatory basis and that the classifications drawn into the statutes had to be reasonable in light of their purpose. Carrington v. Rash, supra, [380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675]. 'We deal here with matters close to the core of our constitutional system.' Carrington v. Rash, supra, 380 U.S. at page 96, 85 S.Ct. [775] at page 780. The right to choose that courts have been so zealous to protect means at the least that states may not casually deprive a class of individuals of the vote or the right of an individual to seek political office because of some remote administrative benefit to the state.

"The attention of this Court has been centered on whether the Ohio Election Laws, to the extent that these laws prevent the qualification of political parties and their candidates for ballot position, satisfy the tests of 'necessity,' 'equality,' and 'reasonableness.' As evidenced both on the face of these statutes as well as in their operational effect, the restrictions imposed do not meet these tests. These restrictions are violative of the equal protection clause of the Fourteenth Amendment and are thus constitutionally impermissible.

"We conclude that to the extent that the Ohio Election Laws impose unreasonable restrictions on the qualifications of political third parties, restrict minority participation in Ohio's electoral process, prevent candidates for president and vice-president from qualifying as independents and deprive plaintiffs of their right of suffrage, either by denial of ballot

position or effective write-in, they are unconstitutional and void."

If the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States is invoked to protect the interests of presidential electors seeking to run as candidates for George C. Wallace's Third Party in the State of Ohio, it can be and must be applied to protect the interests of these Negro and white candidates in the State of Alabama. Indeed, the Alabama Election Law now under scrutiny by this Court that the majority holds is not unconstitutional in its application or on its face requires a declaration of candidacy some eight months prior to the general election. To me, this is constitutionally unreasonable and therefore impermissible. I, therefore, dissent.